**Robert ANDERSON, Plaintiff,**

**v.**

**John M. DOLCE, et al., Defendants.**

**No. 86 Civ. 5121–CLB.**

United States District Court,
S.D. New York.

Feb. 25, 1987.

Arthur H. Grae, White Plains, N.Y., for plaintiff.

Joseph W. Henneberry, the City of White Plains, Dept. of Law, White Plains, N.Y., for defendants.

BRIEANT, Chief Judge.

Pursuant to Rule 56 motions in this action, we are called upon to decide the constitutionality of Section 75, *et seq.*, of the New York State Civil Service Law (McKinney's 1983 and 1987 Supp.). Section 75 sets out the procedures for removal of and other disciplinary action against tenured civil service employees of New York State and its political subdivisions. Plaintiff Robert Anderson is a police officer employed by the City of White Plains faced with probable termination at the conclusion of a disciplinary proceeding relating to, although not exclusively concerned with, an incident in which Officer Anderson allegedly assaulted a civilian.

BACKGROUND

In accordance with Section 75, a pre-termination hearing was scheduled on the charges preferred against Officer Anderson. Before the hearing could get under way, Officer Anderson filed a complaint in federal district court under Section 1983 of Title 42 of the United States Code, claiming that Section 75 of the Civil Service Law does not provide the process that is due a tenured public employee under the Fourteenth Amendment of the United States Constitution, and is therefore facially unconstitutional. Officer

Anderson also claims that Section 75 is unconstitutional as applied in his case.

Defendants in the § 1983 action are John M. Dolce, White Plains Commissioner of Public Safety; Charles A. Bradley, Hearing Officer in the disciplinary proceeding involving Officer Anderson; Anthony Grant, White Plains Corporation Counsel; Joseph W. Henneberry, Senior Assistant Corporation Counsel; the Hon. Alfred Del Vecchio, Mayor of White Plains; Patrick Gleason, Chief of Police; and the City of White Plains.

The incident which prompted the disciplinary action against Officer Anderson occurred on July 5, 1985. Officer Anderson was working off duty as a private security guard at 76 South Lexington Avenue, an apartment building in the City of White Plains. Although the record is not entirely clear, Officer Anderson has worked at 76 South Lexington since 1981 in furtherance of his part time security business. This business apparently includes working as a security guard and supervising other security guards. Police department regulations permit such outside employment.

At or around the time of the July 5th incident, on the ground floor of 76 South Lexington was a barber shop known as John's Hairstylist, run by one Carmine Soddano, a/k/a "John" Soddano. Animosity between Officer Anderson and Mr. Soddano had been building for a few years before the incident. It is not clear how the feud between the two men originated, but hostilities date back to 1981, when Officer Anderson began working at 76 South Lexington. Twice in June 1981, Officer Anderson while on duty as a police officer allegedly witnessed Mr. Soddano being harassed and assaulted by another security guard at 76 South Lexington and refused to offer any assistance or make an arrest based upon a complaint by Mr. Soddano. In October 1981, while off duty and working as a private security guard, Officer Anderson allegedly harassed and assaulted Mr. Soddano resulting in Mr. Soddano's arrest for harassment, resisting arrest, and criminal trespass in the third degree.

Those charges were adjourned in contemplation of dismissal, which is a sort of Scottish verdict. *See* New York Criminal Procedure Law § 170.55 (McKinney's 1982).

Truce apparently was called for a few years, but in 1985, hostilities again erupted. In April 1985, Officer Anderson allegedly entered Mr. Soddano's shop and harassed a friend of Mr. Soddano, one John Mitchell, resulting in the arrest of Mr. Mitchell for disorderly conduct. On June 29, 1985, Officer Anderson issued two motor vehicle summonses to Mr. Soddano for failure to signal and for having defective tail lights. In response, on July 1, 1985, Mr. Soddano registered a formal complaint against Officer Anderson with the Chief of Police charging harassment. On July 4, 1985, the tires on Mr. Soddano's car were slashed by an unknown person.

In the evening of July 5, 1985, Officer Anderson while off duty and working as a security guard had an encounter with Mr. Soddano. Mr. Soddano was in his shop, working on his books at a desk by the front window when Officer Anderson approached. Apparently, Mr. Soddano accused Officer Anderson of being responsible for slashing the tires. The two men exchanged insults and racial epithets, and Officer Anderson has claimed that Mr. Soddano exposed his genitals. Officer Anderson attempted to enter the shop but found the door locked. He called police headquarters requesting a single police car be sent to 76 South Lexington to help him with "a little bit of a situation."

Officer Robert Graham was dispatched to the scene and he has reported that when he arrived, Officer Anderson asked him to assist in arresting Mr. Soddano on charges of harassment and public lewdness. Officer Graham attempted to resolve the dispute peaceably, but at first Mr. Soddano would not allow either Officer Graham or Officer Anderson to enter the shop. Rather, Mr. Soddano telephoned the White Plains police station and requested, to no avail, that the Chief of Police be informed

that Officer Anderson was harassing him. Eventually, Mr. Soddano unlocked the door.

What happened next has been hotly disputed. Officer Graham and Mr. Soddano both have claimed that as soon as the door to the shop was opened, Officer Anderson pushed in front of Officer Graham and took a swing at Mr. Soddano's face, hitting him and knocking him to the floor. Officer Anderson then allegedly jumped on Mr. Soddano, who was bleeding profusely, and began swinging away, hitting Mr. Soddano at least five times. Mr. Soddano started swinging back, but by the time Officer Graham pulled the two apart, Mr. Soddano had sustained numerous contusions on his body and head and a laceration above his left eye. Officer Anderson received a minor cut on his knuckle.

As might be expected, Officer Anderson's version of the scuffle is quite different. He has claimed that as soon as he and Officer Graham entered the shop, Mr. Soddano grabbed a chair and attempted to hit Officer Graham. Mr. Soddano allegedly missed, and fell, cutting himself on the chair. Officer Anderson has alleged that at no time did either he or Officer Graham strike Soddano. One other eyewitness report of the incident is available from the tape recorded radio log of the police dispatcher. At the time of the incident on July 5, 1985, an anonymous caller reported a fight at 76 South Lexington involving police officers.

Mr. Soddano was arrested that evening and charged with harassment, attempted assault and resisting arrest. All charges were ultimately dropped.

Officer Anderson was charged with misdemeanor assault and official misconduct. He was tried before a jury of six and acquitted.

The police department undertook an investigation of the incident, interviewing every officer and civilian involved, including radio dispatchers and officers on duty when Officer Anderson's call for assistance came in. On July 12, 1985, Officer Anderson was served with disciplinary charges, pursuant to Section 75, relating to the July 5th incident but including other infractions of Police Department Rules and Regulations allegedly committed on other dates.

THE DISCIPLINARY CHARGES AND PROCEEDINGS

The charges preferred against Officer Anderson can be summarized as follows:

CHARGE I—four instances of tardiness in reporting for tour of duty;

CHARGE II—one unexcused absence from work amounting to a failure to obey the duty roster which has the force of an order;

CHARGE III—with respect to the incident forming the basis for CHARGE II, failure to follow the prescribed procedure in requesting a personal leave day;

CHARGE IV—one instance of allowing a fellow officer to ride and sit in a vehicle without authorization from a superior officer;

CHARGE V—with respect to the incident forming the basis for CHARGE IV, failure to consult with a superior officer before taking a fellow officer off his post;

CHARGE VI—six occasions of abuse of official power to "control, affect, influence, reward or punish, the ... action, expression or opinion of any person or the lawful business of any person";

CHARGE VII—with respect to the June 29, 1985, issuance of tickets to Mr. Soddano, failure to report to the Chief of Police "the facts surrounding any incident occurring on or off duty where the member is likely to become a complainant or defendant in a civil or criminal action";

CHARGE VIII—a course of conduct amounting to a violation of the Department rule that members of the police force "when within the confines of the City of White Plains are held always to be on duty although periodically relieved from the routine performance of it";

CHARGE IX—with respect to the incident of July 5, 1985, conduct that is "prejudicial to the good order, or reputation of the Department ...";

CHARGE X—with respect to the incident of July 5, 1985, violating New York's criminal assault statute. Department rules note that "A member having been charged with any such offense, is subject to disciplinary action hereunder without regard to the pendency of a criminal court proceeding. A conviction or acquittal in a criminal court of a member shall not act as a bar to disciplinary action hereunder with respect to the conduct of the member";

CHARGE XI—with respect to the incident of July 5, 1985, use of unnecessary force;

CHARGE XII—with respect to the investigation of the incident of July 5, 1985, failure truthfully to answer all questions; and

CHARGE XIII—making a false and misleading statement in a report relating to the July 5, 1985 incident.

These charges were prepared and signed by Patrick Gleason, the Chief of Police, with assistance from the Corporation Counsel's office. John Dolce as the Commissioner of Public Safety is the disciplinary authority, under the Charter of the City of White Plains, for both the police and fire departments, and for purposes of any action pursuant to Section 75. Accordingly, Commissioner Dolce signed the notice of disciplinary action served on Officer Anderson, which notice referred to and attached the charges preferred by Chief Gleason, specified the time allowed for the filing of an answer, informed Anderson of the right to a hearing and to present witnesses and proof in defense of the charges, set the date, time and place of the hearing, and set forth all permissible penalties, including dismissal.

On July 16, 1985, Commissioner Dolce designated an attorney in private practice, Charles Bradley, Esq., former Corporation Counsel of the City of White Plains, to act in the Commissioner's place as hearing officer. Section 75, subd. 2. On August 1, 1985, Mr. Bradley convened the hearing. Officer Anderson moved to recuse and disqualify the Mr. Bradley on the ground that he is a former Corporation Counsel. Mr. Bradley denied this motion.

The hearing was adjourned from time to time without evidence being presented pending the conclusion of the criminal action against Officer Anderson, and to allow the Corporation Counsel to prepare a bill of particulars requested by Officer Anderson pursuant to Section 75, subdivision 2. Officer Anderson was suspended without pay pending the hearing for the maximum period of thirty days. Section 75, subd. 3. Upon the expiration of the thirty day period, Officer Anderson was restored to his position and has been working steadily with full pay ever since.

The hearing was finally scheduled for June 30, 1986. On June 27, 1986, Officer Anderson commenced this § 1983 action contesting the constitutionality of Section 75 of the New York Civil Service Law on the ground that it impermissibly combines the functions of adjudicator and investigator of disciplinary charges. The parties met with the hearing officer on June 30 and adjourned the hearing without a date, pending motions to be made in this action. These motions for summary judgment were fully submitted to this Court on January 21, 1987.

## THE NEW YORK CIVIL SERVICE LAW

The New York Civil Service Law, particularly Section 75's protections against removal of a public employee without cause, represents over a century of reform and cultivation of the rules and practices governing public employment. Today's civil service operates under the so-called "merit system" which came to New York State in 1883. The merit system replaced the "spoils system," which had flourished in New York, regardless of what political party was in power, since the State had its first Governor—George Clinton—in 1777. For 106 years before 1883, government jobs were given in recognition of partisan political activities, or sometimes sold for money. Election reverses suffered by the appointing authority led usually to instant discharge of its appointees.

Under the spoils system, faithful party members hired as civil servants were not required by law to possess any skills, knowledge, or ability, or even the inclination to show up at the job. Those who selected them were subject, however, to being held responsible for any failure of services when the next election came about. Reformers of the day complained that the spoils system bred inefficiency, absenteeism, extravagance, interference in public business, corruption of the electoral franchise, and the practice of levying political assessments on civil servants. Supporters of the spoils system pointed out that it preserved party unity and ensured loyalty to democratically elected government officials and their political platforms. It took a half-century of reform efforts on a national and state level, beginning in the mid-1800s, to bring about the ascendancy of a civil service merit system, coupled with a concurrent increase in the size, power and independence of the resulting bureaucracy.

For a time in nineteenth century New York, patronage—the bestowing of jobs through favoritism—was handled through the politically controlled Council of Appointment, which distributed positions to thousands of the politically faithful. The situation was not at all improved when a new State Constitution in 1821 divested the Council of the appointing power and bestowed it upon the Governor, requiring him to have the advice and consent of the State Senate. This gave rise to the "Albany Regency" which, in its early days, was used by Martin Van Buren, William Marcy and others to control job appointments for political purposes. It was Marcy, a United States Senator from New York, who responded to Henry Clay in a Senate debate in 1832 by saying, in defense of New York's appointment practices, "to the victors belong the spoils," a comment which gave rise to the term "spoils system."

The job situation was similar on the federal level and in 1871, President Ulysses S. Grant summed it up by saying,

"The moral tone of the country is debased. The national character deteriorates. No country or government can safely tolerate such a surely increasing demoralization."

In 1872, President Grant appointed New Yorker George William Curtis, a founder of the Civil Service Reform Association, to head a commission to "prescribe rules and regulations for Civil Service of the United States." But the federal government continued to tolerate patronage until the assassination of President James A. Garfield in 1881 by Charles J. Guiteau, a disgruntled job seeker.

President Garfield was constantly involved in stormy battles over government jobs. While in Congress, he was an opponent of civil service reform; as President, he was harassed by office seekers. Guiteau was a New York Republican party worker who visited the White House *daily* in an unavailing effort to press his application for appointment as United States Consul in Paris. In his frustration and rage, he assassinated President Garfield and aroused public opinion throughout the nation. In the closing days of 1882, Congress, now particularly sensitive to anti-spoils system sentiment, passed a Civil Service act, the Pendleton Bill, which was quickly signed into federal law by President Chester A. Arthur on January 16, 1883. It is one of the ironies of our history that President Arthur was involved earlier as Collector of the Port of New York in a patronage controversy, as a result of which he was removed from that office.

In view of the great number of New Yorkers involved in the civil service movement on the national level, it was understandable that New York State accepted the idea of merit selection at about the same time. Assemblyman Theodore Roosevelt piloted a civil service bill through the lower house of the New York State legislature, and final legislative approval was given on May 4, 1883. Governor Grover Cleveland, who campaigned on a platform of civil service reform, signed the bill into law that same day, making New York the first state in the nation to follow the federal government's lead. The first State Civil Service Commission, a bi-partisan

group, was appointed almost immediately and held its first meeting in Albany on May 31, 1883.

Not everyone in 1883 perceived New York State's new Civil Service Law as a cure-all for the abuses of the spoils system. Some criticized the law's creation of three more patronage jobs—Civil Service Commissioners at annual salaries of $2,000 each, with a total budget of $15,000. Others looked on more favorably. George William Curtis appraised the situation:

> "It is in New York that the evils and the perils, the dishonor, the corruption, the degradation of the system have been most fully displayed. And it was in New York also that the first vigorous, resolute and unquailing opposition to the evil system was organized. It was most fitting, therefore, that the chief sinners among the states should lead the van of reform."

The advance of civil service in New York was not continuous. From 1883 to 1899, civil service remained the center of some kind of political test or or another. Disagreement with the Governor over appointments on one occasion led to the removal of the entire Civil Service Commission. In 1894, New York became the first state to enact an express constitutional requirement that "merit and fitness shall govern" civil service appointments. New York Constitution Art. V, § 9, recodified as § 6. However, in 1897, Governor Frank S. Black obtained passage of a bill, later known as the Black Law, which stripped the Civil Service Commission of its exclusive right to give examinations or otherwise qualify candidates for jobs. As growing numbers of people were hired without examinations, Civil Service Commissioner Silas W. Burt protested that the new system was actually a spoils system in disguise.

The Black Law lasted only two years. Theodore Roosevelt succeeded Black as governor in 1899 and moved at once to replace the Black Law with the appropriately named White Law, so designated because it was sponsored by State Senator Horace White. The White Law returned to the Civil Service Commission its exclusive examining power and tightened regulations to prevent future evasions of the merit system.

The New York Civil Service Law underwent major revision last in 1909, and was recodified in 1958. The resulting bureaucracy, multi-layered and unaccountable to democratic processes, has staved off further reform efforts by resort to the numerous statutory protections originally intended to inculcate a meritocracy. However unintentional, the civil service bureaucracy often presents an unsurmountable obstacle to the implementation of the campaign promises of elected officials.

Except for a short-lived reform movement in the 1970s criticizing the civil service laws as fostering too much red tape and centralization, and too little accountability and real merit, the legacy of Theodore Roosevelt and Grover Cleveland remains intact. The monumental struggle and numerous compromises that marked the civil service reform movement is reflected in the legislative product which survives today. Chief among those compromises is Section 75 of the Civil Service Law, formerly section 22. This statute retains the essence of the original reforms—a limitation on removals without cause from public office or employment. That it would be drafted differently today, separating the adjudicator from the investigating and charging party is undoubtably true.

PROCEDURAL PROTECTIONS AGAINST REMOVAL OF PUBLIC EMPLOYEES

Under Section 75, a permanent competitive civil service employee, such as a police officer, cannot be removed from his job or otherwise disciplined "except for incompetency or misconduct shown after a hearing upon stated charges." The procedure to be followed is set forth:

> "A person against whom removal or other disciplinary action is proposed shall have written notice thereof and of the reasons therefor, shall be furnished a copy of the charges preferred against him and shall be allowed at least eight

days for answering the same in writing. The hearing upon such charges shall be held by the officer or body having the power to remove the person against whom such charges are preferred, or by a deputy or other person designated by such officer or body in writing for that purpose. In case a deputy or other person is so designated, he shall, for the purpose of such hearing, be vested with all the powers of such officer or body and shall make a record of such hearing which shall, with his recommendations, be referred to such officer or body for review and decision. The person or persons holding such hearing shall, upon the request of the person against whom charges are preferred, permit him to be represented by counsel, or by a representative of a recognized or certified employee organization, and shall allow him to summon witnesses in his behalf. The burden of proving incompetency or misconduct shall be upon the person alleging the same. Compliance with technical rules of evidence shall not be required."

Section 75 replaced the much criticized system of politically motivated removals of civil servants with a fairly straightforward and expeditious hearing process. While the civil service reformers won the right to have cause determined prior to the removal of a public employee, that determination was not to burden the operations of the public agency involved or to impede the delivery of services. As a matter of first impression, the determination of cause was to be vested in the agency's disciplinary authority, that is, the agency's "officer or body having the power of removal." In most cases, the disciplinary authority is the head of the agency, which for the police department of White Plains is the Commissioner of Public Safety. Charter of the City of White Plains § 220. Under Section 75, the functions of investigating, charging and adjudicating employee misconduct and incompetency are direct and unified.

Once charges are preferred against a public employee, the disciplinary authority (here Commissioner Dolce) has the option under the statute of presiding over an evidentiary hearing on the charges, or appointing a hearing officer. If so appointed, the hearing officer receives and rules on the evidence, keeps a record of the proceeding, and makes a recommendation to the disciplinary authority as to disposition of the charges. The disciplinary authority is not bound by the hearing officer's recommendation; however, the final determination of the disciplinary authority must be based on "substantial evidence" present on the record. The use of hearing officers in disciplinary proceedings is widespread in New York's public agencies, recognized as a means of relieving the administrative burdens on agency chiefs. Judicial review of the final determination of the disciplinary authority is available through Article 78.

In view of the history of New York Civil Service Law, we now turn to the complaint in this action which charges that Section 75 is unconstitutional on its face and as applied because it violates the due process clause of the Fourteenth Amendment of the United States Constitution. Section 75 as amplified by the cases decided thereunder provides numerous procedural protections for public employees. The charged party is entitled to:

a) notice in writing of the charges;

b) eight days to respond;

c) a right to a bill of particulars if demanded;

d) an impartial hearing officer if one is appointed;

e) a full pre-termination or pre-penalty hearing, rather than a "probable cause" hearing followed by a post-termination hearing;

f) representation by counsel and/or union representative;

g) the right to present evidence and confront and cross-examine witnesses;

h) a maximum of 30 days suspension without pay pending the hearing and determination;

i) the right to comment upon any favorable and unfavorable material in the em-

ployee's personnel file on the issue of punishment;

j) a statute of limitations against the commencement of charges more than eighteen months from the occurrence date, unless such charges would constitute a crime; and .

k) a right to back pay if acquitted.

Under Section 76 of the Civil Service Law, an employee may appeal a determination under Section 75 either to the appropriate civil service commission or by way of an Article 78 proceeding under New York C.P.L.R. Since determinations under Section 75 are made after a hearing and upon "substantial evidence," subsequent Article 78 petitions are heard in New York directly by the Appellate Divisions of the Supreme Court. C.P.L.R. §§ 7803(4) and 7804(g).

Section 77 of the Civil Service Law provides that the New York courts have full power to order reinstatement, award back pay, modify the punishment, or remand for a new hearing, which by judicial interpretation requires reinstatement and back pay pending a new determination. It is no secret that this power is exercised frequently.

Section 891 of the New York Unconsolidated Laws, enacted in 1940, specifically provides that a police officer serving in the competitive class of civil service in any city shall not be removed except for incompetency or misconduct shown "after a hearing upon due notice upon stated charges, and with a right ... to be represented by counsel ..." and to have judicial review under Article 78. This statute is entirely consistent with Section 75.

## THE CONSTITUTIONAL CHALLENGE

Officer Anderson charges in his complaint that Section 75 is unconstitutional on its face because it allows the disciplinary authority, here Commissioner Dolce, to prefer the charges, select the prosecuting attorney, select the hearing officer if one is to be used, and render the final determination regardless of a hearing officer's recommendation. This procedure allegedly violates due process which, according to the complaint, requires that the one who adjudicates party be independent of the investigative and charging party.

On his motion for summary judgment, Officer Anderson argues that the overlapping of functions provided for in Section 75 poses a high risk that a disciplinary proceeding, whether conducted by the disciplinary authority personally or by a designated hearing officer, will be adjudicated by a biased and partisan tribunal and thereby rendered meaningless—a sham conducted by a "kangaroo court." The complaint faults the disciplinary authority's absolute right to credit all testimony given against the employee and to discredit all favorable testimony based on findings of credibility. By vesting such discretion in the disciplinary authority, Section 75 purportedly does little to protect the public employee who does not get along with his superiors but otherwise adequately performs his job. In other words, Officer Anderson is arguing that Section 75 is inadequate to eradicate every last vestige of the old spoils system of the nineteenth century because the statutory scheme lends itself to manipulation and evasion by the disciplinary authority.

It is not clear that the statutory scheme, as currently construed by the state courts, vests as much power in the discplinary authority as Officer Anderson claims. Rather, Section 75 entrusts the disciplinary authority with notifying the employee of the charges, selecting the hearing officer, and rendering the final determination. Furthermore, the record before this Court establishes that Commissioner Dolce did no more than what is required by statute. There is no evidence that he himself factually determined the charges in this case which were prepared and signed by Chief Gleason, although he could have done so under the statute. There is no evidence that he selected the prosecuting attorney, who was necessarily a member of the Corporation Counsel's staff and received assignments from Corporation Counsel Anthony J. Grant. However, for the purposes of this motion, the Court will assume that Commissioner Dolce did have a hand in the

actions taken by Chief Gleason and Mr. Grant with respect to this case, or that if he did not, he could have done so by asserting his statutory power.

Alternatively, the complaint charges that Section 75 is unconstitutional as applied to Officer Anderson. Commissioner Dolce appointed as hearing officer a private attorney, Charles Bradley, former Corporation Counsel for the City of White Plains. As Corporation Counsel, Mr. Bradley had had occasion in the past to counsel Commissioner Dolce and to supervise Senior Assistant Corporation Counsel Joseph W. Henneberry, the prosecuting attorney in Officer Anderson's case. In addition, Mr. Bradley was the attorney of record prosecuting Officer Anderson in at least two prior Section 75 proceedings in which Officer Anderson was found guilty of disciplinary charges unrelated to this case. These relationships with, and old allegiances to, the offices of the Corporation Counsel and the Commissioner of Public Safety allegedly prevent Mr. Bradley from rendering a fair and impartial decision in the disciplinary proceeding against Officer Anderson.

This "as applied" argument would prohibit Commissioner Dolce from exercising his statutory appointment power to designate a hearing officer in any way acquainted with either party to the proceeding. It necessarily follows from this argument that Commissioner Dolce himself, and the disciplinary authority of every public agency, would be disqualified from presiding at disciplinary proceedings. Section 75 would in effect be replaced by a far more cumbersome procedure, not authorized by the state legislature.

DISCUSSION

As a preliminary matter, we must determine what constitutional due process is required for a tenured civil service employee faced with removal or discipline. The fundamental requisite of due process of law is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981); *Goldberg v. Kelly*, 397 U.S. 254 at 267, 90 S.Ct. 1011 at 1020, 25 L.Ed.2d 287. The essence of Officer Anderson's claim is that the pre-termination hearing provided is meaningless because the statute does not ensure an impartial adjudicator, and that post-termination judicial review is thereby rendered inadequate because it relies on biased fact finding.

Apart from his claim that the tribunal at the evidentiary hearing would be biased, Officer Anderson has not contended that the hearing would not be a full adversary proceeding. No issue has been raised concerning the circumstances, if any, in which a disciplinary authority in New York could remove a tenured public employee without first holding an adversary proceeding.

Officer Anderson's federal constitutional claim depends on his having a property right in continued employment. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....'" *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) *("Loudermill")* (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548). Both federal and state courts have found that Section 75 creates a property interest in continued employment, with the requisite minimum standards of due process attaching. *Dwyer v. Regan*, 777 F.2d 825, 829 (2d Cir.1985); *Berns v. Civil Service Commission*, 537 F.2d 714 (2d Cir. 1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977); *Economico v. Village of Pelham*, 50 N.Y.2d 120, 125, 126, 428 N.Y.S.2d 213, 405 N.E.2d 694 (1980).

The amount of process due in employment deprivation cases was announced in *Loudermill*, where the Court required that the State of Ohio provide some type of pre-termination hearing to a school bus driver fired for lying about a prior felony conviction on his job application. The Court found that, in light of the procedures available for post-termination administra-

tive review, it would be sufficient to provide " 'something less' than a full evidentiary hearing" prior to termination. 470 U.S. at 545, 105 S.Ct. at 1495. All that "[t]he tenured public employee is entitled to [at the pre-termination stage is] oral and written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495.

At least that much process is provided by the New York statute contested here. Supplemented with Article 78 review, Section 75 satisfies the *Loudermill* requirements of due process in employment deprivation cases. Although it is not necessary to rely on *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 250 (2d Cir.1985), the Second Circuit determined in that case that Article 78 review, by itself, provides all the process due in a property deprivation case based on alleged contractual rights. *See also Sullivan v. Town of Salem*, 805 F.2d 81, 86 (2d Cir.1986) ("One form of adequate remedy [for a deprivation of property] might lie in an administrative appeal, another in judicial review of the administrative decision.").

■ Having granted civil service employees such as Officer Anderson a pre-termination opportunity to be heard, New York must comply with the well-established principle that a fair hearing requires an impartial tribunal. *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1463, 43 L.Ed.2d 712 (1975). This applies to administrative agencies which adjudicate, as well as to courts. *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). The *Withrow* Court addressed the question at issue here: whether the combination of investigative and adjudicative functions in one body renders a hearing unconstitutional because of the probability of actual bias on the part of the judge or decision maker.

In *Withrow*, a medical licensing board had statutory authority to conduct investigations of licensed physicians, to prefer charges of misconduct, to rule on those charges, and to impose punishment includ-

ing suspension and revocation of the license to practice medicine. The Court noted that the maxim that no man should be judge in his own cause clearly extends to "cases in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." 421 U.S. at 47, 95 S.Ct. at 1464 (footnotes omitted). Neither the pecuniary interest nor the personal antagonism rationale for disqualifying the adjudicator was present in *Withrow*. Similarly, there is no suggestion here that either Commissioner Dolce or the hearing officer, Mr. Bradley, had any pecuniary interest in the outcome of the disciplinary charges against Officer Anderson, or that either of them had ever been the target of personal abuse or criticism by Officer Anderson.

The *Withrow* Court then stated that the combination of investigative and adjudicative functions in the licensing board did not necessarily create an unconstitutional risk of bias in administrative adjudication. Such a contention

"must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." 421 U.S. at 47, 95 S.Ct. at 1464.

In other words, an overlap of investigative and adjudicative functions alone, without further factual demonstration of bias or prejudice inherent in the particular application of the statutory scheme, does not violate due process. Commissioner Dolce and Mr. Bradley each have the benefit of a presumption of honesty and integrity in their service as adjudicators in this case. That Section 75 intends such a presumption operate is clear from the very provision combining the adjudicative and investigative functions.

Other decisions of the Supreme Court similarly squarely reject the notion that the combination of judging and investigating functions is necessarily a denial of due process. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (that social security examiners have responsibility for developing facts and making decisions as to disability claims is constitutional in view of the "great and growing complexity" of administering the social security system); *FTC v. Cement Institute,* 333 U.S. 683, 701, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948) (that members of the Commission had investigated challenged pricing system and reported on it to Congress before filing complaint and holding hearings "did not necessarily mean that the minds of its members were irrevocably closed on the subject"); *see also NLRB v. Donnelly Garment Co.,* 330 U.S. 219, 236–37, 67 S.Ct. 756, 765, 91 L.Ed. 854 (1947) (hearing examiner, who had recommended findings of fact after rejecting certain evidence as not probative, was not disqualified to preside at further hearings that were required when reviewing courts held that the evidence had been erroneously excluded).

The *Withrow* Court did express some concern over the issue of whether and to what extent distinctive administrative functions should be performed by the same person. However, that decision offers no support for Officer Anderson's proposition that, having participated in the preparation and investigation of the charges against an officer under his disciplinary authority, Commissioner Dolce must recuse himself from hearing the charges personally or from making a final determination on the charges based on a hearing officer's recommendation. "The incredible variety of administrative mechanisms in this country will not yield to any single organizing principle." *Withrow v. Larkin,* 421 U.S. at 52, 95 S.Ct. at 1467. Due process jurisprudence requires balancing the private interest at stake against the state interest in the challenged procedure. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970).

Not the least because of the prospect of civil liability for an employee's misconduct, New York State has an interest in prompt and efficient procedures for terminating an employee who fails to obey the rules and regulations governing his class of employment. This is especially true when the employee is a police officer, a position involving constant, and frequently perilous, contact with the public. In enacting Section 75, originally Section 22, of the Civil Service Law, the New York legislature of 1883 struck a balance that protects public employees against political whim, but also protects the public against the high cost of bureaucratic inefficiency and red tape. In view of the standards set out in *Loudermill,* the due process protections afforded by the New York Civil Service Law, considered together with the availability of Article 78 review, Section 75 cannot be held unconstitutional on its face, notwithstanding the overlapping of investigative and adjudicative functions. *Cf. Bolden v. Alston,* 810 F.2d 353 (2d Cir.1987) (superintendent of correctional facility not liable under § 1983 for "dual role" in disciplinary proceeding; the fact that he controlled every aspect of proceeding, conducted it, interviewed witnesses outside presence of inmate, was the finder of fact, and ultimately passed judgment thereon, "is not inconsistent with due process").

■ The issue remains whether, as applied to the facts of this case, Section 75 violates due process because of the alleged bias of the hearing officer, Mr. Bradley, and of the ultimate disciplinary authority, Commissioner Dolce. The record does not contain any accusation that Commissioner Dolce was moved by *actual* bias or prejudice against Officer Anderson in preferring charges and initiating a disciplinary action. Rather the allegations regarding Commissioner Dolce revolve solely around the fact that he serves as both adjudicative and investigative authority, a procedure contemplated by Section 75. Thus, the only question to resolve is whether the hearing

officer, Mr. Bradley, has evidenced bias or prejudice or an appearance of impropriety violating the due process requirement of an impartial adjudicator.

As the *Withrow* Court suggested, the situations that threaten the impartiality of an adjudicator can be divided into three categories: 1) pecuniary interest, *e.g.*, *Ward v. Village of Monroeville*, 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio*, 273 U.S. 510, 531, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927); 2) personal bias, *e.g.*, *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); *Pickering v. Board of Education*, 391 U.S. 563, 578–79 n. 2, 88 S.Ct. 1731, 1740 n. 2, 20 L.Ed.2d 811 (1968); and 3) predisposition to facts or law, *e.g.*, *Laird v. Tatum*, 409 U.S. 824, 835, 93 S.Ct. 7, 13, 34 L.Ed.2d 50 (1972); *FTC v. Cement Institute*, 333 U.S. 683, 700, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948).

Whether the claimed partiality amounts to a constitutional ground for disqualification is usually a matter for case by case determination. However, the Supreme Court has had occasion to provide guidance in analyzing the due process issue as it has arisen in all three categories of partiality. In *Tumey v. Ohio*, the Court ruled unconstitutional an Ohio scheme in which a municipal judge's salary held a direct relation to the criminal fines he imposed. The practice of paying the judge by the conviction amounted to a "possible temptation to the average man as a judge" to take his financial interests into consideration when ruling in a case. 273 U.S. at 523, 47 S.Ct. at 441.

The *Tumey* Court went on to distinguish financial interests from other types of potential bias and announced that

"[a]ll questions of judicial qualification may not involve constitutional validity. Thus, matters of kinship, personal bias, state policy, remoteness of interest, would seem to be matters merely of legislative discretion." 273 U.S. at 523, 47 S.Ct. at 441.

Thus, the Supreme Court has been extremely reluctant to disqualify a judge for "personal bias," finding a due process violation only where the judge and one of the litigants or attorneys are embroiled in a heated personal dispute. *See, e.g., In re Murchison*, 349 U.S. 133, 138, 75 S.Ct. 623, 626, 99 L.Ed. 942 (1955); *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954); *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925).

■ The third category of partiality—a predisposition to facts or law—is the one implicated in Officer Anderson's claims. The Supreme Court has never held specifically that prior exposure to material facts or prior adherence to a legal position violates due process. Rather, it has held that an alleged predisposition does not necessarily indicate an inability to provide a fair hearing. In *FTC v. Cement Institute*, the Court refused to disqualify the Federal Trade Commission from adjudicating a case, even though the Court assumed that a prejudgment of the issues "had been formed by the entire membership of the Commission as a result of prior official investigations." 333 U.S. at 700, 68 S.Ct. at 803. The Court pointed out that if the Commission were disqualified, no government agency would be able to act on a complaint without disqualifying itself from adjudicating the case. 333 U.S. at 701, 68 S.Ct. at 803.

Unlike *Cement Institute*, there is no claim here that the adjudicator, Mr. Bradley, had prior knowledge of material facts. Officer Anderson has requested Mr. Bradley's disqualification based only on his participation in at least two prior Section 75 proceedings against Officer Anderson on different and unrelated charges. Clearly, *Cement Institute* does not require this result. Rather, the case law promotes variety and flexibility in administrative procedures, including those procedures used to discipline employees.

■ Similar logic applies to the allegation that Mr. Bradley's former employment as Corporation Counsel disables him from rendering a fair and impartial decision in a proceeding prosecuted by a former subor-

dinate, Mr. Henneberry. Alone this allegation ought not amount to an appearance of impropriety requiring recusal, or else the administrative agencies and court systems of this nation would be deprived of the talents and skills of those adjudicators whose earlier careers have been devoted to public service.

■ As for any allegation, not clearly made here, that Mr. Bradley is predisposed as to the resolution of legal issues in this case, the Supreme Court has pointed out that it is impossible and not necessarily desirable to eliminate all predisposition as to legal issues. In *Laird v. Tatum,* Justice Rehnquist refused to disqualify himself from participating in a decision which turned on a legal issue that he had publicly spoken about before his appointment to the Court, stating

> "[p]roof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." 409 U.S. at 835, 93 S.Ct. at 13.

The New York courts have addressed in more detail the issue of adjudicative impartiality, particularly claims of personal bias and predisposition, in the course of setting out standards for post-termination review of Section 75 decisions. From this Court's consideration of the state courts' decisions, it may well be that when reviewing an Article 78 petitioner's claims of bias, the state courts apply more stringent standards than those required by the United States Constitution. However, we are mindful that decisions by Article 78 courts are handed down after the conclusion of a Section 75 hearing and after the disciplinary authority has announced a final determination, and thus are informed by a complete hearing record. The disciplinary proceeding against Officer Anderson has been adjourned pending the outcome of summary judgment motions in the instant action and thus no hearing record, as such, exists. Once the hearing resumes, grounds for future claims of bias may well arise. At this stage of the proceeding against Officer

Anderson, however, even assuming as Officer Anderson insists, that his termination is a foregone conclusion, New York's decisional law does not require this Court to declare the hearing a nullity.

■ The numerous occasions on which the Appellate Division has ruled on claims of bias provides guidance in this case. Where a hearing officer is designated under Section 75, disqualification for bias is available if the record indicates that the hearing officer had prior knowledge of the facts to be determined or had personally initiated the investigation. *See Dejnozka v. City of Saratoga Springs,* 68 N.Y.2d 947, 949–950, 510 N.Y.S.2d 85, 502 N.E.2d 1000 ("Commissioner was not obliged to disqualify himself as the hearing officer [because he] had no particular knowledge of material disputed facts ... [and his] conduct did not reflect partiality with regard to petitioner's hearing"); *Horton v. Ames,* 75 A.D.2d 853, 427 N.Y.S.2d 845, 847 (App.Div.2d Dep't 1980) (determination annulled in part because "the record manifests several undisputed incidents which gravely impaired the Commissioner's ability to have considered, without bias or prejudgment, the evidence at the hearing on the charges"); *Sengstaken v. McAlevey,* 39 A.D.2d 965, 333 N.Y.S.2d 834, 835 (App. Div.2d Dep't 1971) (building inspector discharged from his position was denied due process when hearing officer appointed by the town board made recommendations which were adopted by the town board of which he was a member with the hearing officer casting the deciding vote).

■ A fair summary of New York law is that the mere appointment as hearing officer of an attorney with some past or present connection to the administrative agency in charge of investigating, charging, prosecuting, or disciplining the employee, in and of itself is not a denial of due process. *See, e.g., Pollman v. Fahey,* 106 A.D.2d 771, 483 N.Y.S.2d 805, 807 (App. Div.3d Dep't 1984) (employee received fair and impartial hearing notwithstanding that hearing officer was chief attorney for department where employee worked and as

such supervised attorney who represented department); *Wiegert v. Koenig*, 75 A.D.2d 908, 427 N.Y.S.2d 320, 322 (App.Div.3d Dep't 1980) (hearing board was properly constituted even though chief of police acted as secretary, preferred charges against officer, and testified as to officer's action, because chief of police was not voting member); *Greaney v. Bahou*, 57 A.D.2d 646, 393 N.Y.S.2d 211, 212–13 (App.Div.3d Dep't 1977) (department comptroller may act as hearing officer although his subordinates in department called as witnesses against the employee).

*Pelaez v. Waterfront Commission of New York Harbor*, 88 A.D.2d 443, 454 N.Y.S.2d 132, 135 (2d Dep't 1982), offers an example of what conduct it takes to disqualify a hearing officer. The court there annulled the determination to suspend an employee because the "hearing officer was familiar with substantially all the pertinent facts before the hearing commenced and because he acted in an adversary role prior to and during the hearing with respect to petitioner's application before Special Term to vacate his payless suspension." 88 A.D.2d at 447, 454 N.Y.S.2d at 135. The court emphasized, however, that

> "the issue is not the propriety of the internal separation of the investigative, prosecutorial, adjudicatory and policy-making function within the administrative agency ..., or the subordination of both prosecutorial staff and hearing officers to one agency superior...."

88 A.D.2d at 447, 454 N.Y.S.2d at 135. The issue, rather, is whether the adjudicator has some prior familiarity with the particular facts he is to adjudicate.

In the proceeding disputed here, Mr. Bradley fully disclosed any relationships he had with any party to the proceeding. *See Romeo v. Union Free School District No. 3*, 64 A.D.2d 664, 407 N.Y.S.2d 513, 516 (App.Div.2d Dep't 1978) (determination annulled because hearing officer failed to disclose long personal and business relationship with the director of the school district). There is no evidence that he had any knowledge of the facts underlying the specific charges preferred against Officer Anderson on July 12, 1985. Nothing in the record on these motions impugns Mr. Bradley's impartiality. Absent something more than conclusory allegations of bias and impropriety, due process is not violated by Mr. Bradley hearing the charges against Officer Anderson.

Section 75 of the Civil Service Law is constitutional on its face and as applied to Officer Anderson's case. The hearing on the disciplinary charges should proceed, keeping in mind that Officer Anderson is nonetheless entitled to Article 78 review of whatever decision ensues and to raise therein claims regarding any impropriety that may arise during the course of the hearing.

Summary judgment is granted in favor of defendants and is denied as to plaintiff. The Clerk shall enter final judgment. No costs.

So Ordered.