266 F.3d 64 (2nd Cir. 2001)
 GARY LEVENTHAL, PLAINTIFF-APPELLANT,
v.
LAWRENCE KNAPEK, INDIVIDUALLY AND AS ASSISTANT COMMISSIONER FOR THE OFFICE OF BUDGET AND FINANCE OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW YORK, JOHN SAMANIUK, INDIVIDUALLY AND AS DIRECTOR OF THE OFFICE OF INTERNAL AUDIT AND INVESTIGATION OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW YORK, LOUIS P. DESOL, INDIVIDUALLY AND AS DIRECTOR OF THE EMPLOYEE RELATIONS BUREAU OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW YORK, MICHAEL J. MCCARTHY, INDIVIDUALLY AND AS THE DIRECTOR OF THE DIVISION OF BUDGET AND FINANCE OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW YORK, THERESA VOTTIS, INDIVIDUALLY AND AS ASSOCIATE INTERNAL AUDITOR IN THE OFFICE OF INTERNAL AUDIT AND INVESTIGATION OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW YORK, NEW YORK STATE DEPARTMENT OF TRANSPORTATION AND JOSEPH H. BOARDMAN, INDIVIDUALLY AND AS COMMISSIONER OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW YORK, DEFENDANTS-APPELLEES.
 Docket No. 00-9306
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: April 19, 2001
Decided September 26, 2001
 
 Appeal from a judgment of the United States District Court for the Northern District of New York (Norman A. Mordue, Judge) granting defendants' motion for summary judgment, denying plaintiff's cross- motion for summary judgment, and dismissing the complaint in a suit arising from defendants' search of plaintiff's workplace computer.
 Even though, based on the particular facts of this case, plaintiff had some expectation of privacy in the contents of his computer, the searches were reasonable in light of the Department of Transportation's need to investigate allegations of misconduct as balanced against the modest intrusion caused by the searches. Plaintiff's constitutional due process rights were not violated by his loss of a provisional job appointment and failure to receive a discretionary salary increase because neither involved a property or liberty protected by the Fourteenth Amendment.
 Affirmed.[Copyrighted Material Omitted]
 Brian J. O'Donnell, Rowley, Forrest, O'Donnell & Beaumont, P.C., Albany, New York (Jessica R. Wilcox on the brief), for plaintiff-appellant.
 Julie M. Sheridan, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Daniel Smirlock, Deputy Solicitor General, Peter H. Schiff, Senior Counsel), for defendants-appellees.
 Before: Leval, Sack, and Sotomayor, Circuit Judges.
 
 Sotomayor, Circuit Judge
 
 1
 After receiving anonymous allegations that an employee reasonably suspected to be plaintiff-appellant Gary Leventhal was neglecting his duties in the Accounting Bureau of the New York State Department of Transportation ("DOT"), DOT investigators, without Leventhal's consent, printed out a list of the file names found on Leventhal's office computer. The list of file names contained evidence that certain non- standard software was loaded on Leventhal's computer. This led to additional searches confirming that Leventhal had a personal tax preparation program on his office computer and to disciplinary charges against Leventhal for misconduct. After settling the disciplinary charges, Leventhal sued defendants-appellees, challenging the legality of the searches and of two employment actions taken against him.
 
 
 2
 We affirm the district court's grant of summary judgment to defendants, its denial of Leventhal's cross motion for summary judgment, and its dismissal of the complaint. Even though, based on the particular facts of this case, Leventhal had some expectation of privacy in the contents of his computer, the searches were reasonable in light of the DOT's need to investigate the allegations of Leventhal's misconduct as balanced against the modest intrusion caused by the searches. With respect to the challenged employment actions, Leventhal's constitutional due process rights were not violated by his loss of a provisional job appointment and his failure to receive a discretionary salary increase because neither involved property or liberty interests protected by the Fourteenth Amendment. Because we find that the DOT did not violate Leventhal's Fourth or Fourteenth Amendment rights, there is no need for us to address whether defendants enjoyed qualified immunity from suit.
 
 BACKGROUND
 
 3
 Leventhal began his career at the DOT in 1974. At the time of the searches in question, Leventhal had risen to the position of Principal Accountant in the Accounting Bureau of the DOT, a grade 27 position. In 1996, and for several previous years, Leventhal maintained a private tax practice while employed at the DOT. He received DOT approval to make up on weekends or after normal work hours any time he missed because of his outside employment. In order to receive approval for this arrangement, Leventhal declared that his outside employment would "not interfere with the complete and proper execution of my duties with the Department of Transportation."
 
 A. DOT Policies and Procedures
 
 4
 The DOT had a written policy prohibiting theft. The policy broadly defined theft to include:
 
 
 5
 improper use of State equipment, material or vehicles. Examples include but are not limited to: conducting personal business on State time; using State equipment, material or vehicles for personal business; improper use of the mail, copiers, fax machines, personal computers, lincs codes or telephones and time spent on non-State business related activities during the workday.
 
 
 6
 During the DOT's interrogation of Leventhal after the searches of his office computer, Leventhal acknowledged that using DOT equipment for private purposes was "a violation of [DOT] policies."
 
 
 7
 The DOT also had an unwritten rule that only "standard" DOT software could be loaded on DOT computers. Although this rule was never officially promulgated as a DOT policy, Leventhal remarked during his interrogation that "the stated policy" was that employees were not to have personal software on a DOT computer "without permission." Nevertheless, it was known that the staff of the Accounting Bureau had loaded unlicensed copies of "non-standard" software on DOT computers and used the software to perform work-related activities due, at least in part, to the DOT's inability to purchase needed software for its employees. The DOT also had an official policy restricting office Internet access to DOT business.
 
 
 8
 In July 1996, the DOT circulated a memo from Ann Snow, the Network Administrator for the Budget and Finance Division, which stated that only original, licensed copies of software could be installed on DOT computers. Following the distribution of this memo, however, Leventhal's supervisors discussed their difficulties in complying with the memo because of the department's dependance upon the use of unlicensed software. Leventhal's immediate supervisor at the time, John Chevalier, instructed his subordinates, including Leventhal, that they could continue to use non-standard software for departmental business.
 
 
 9
 DOT computers were accessible, for certain limited purposes, by those other than their normal users. The computer support staff of the DOT engaged in troubleshooting and the upgrading of individual computers. During these maintenance operations, it was possible for the computer staff to observe whether non-standard DOT software had been loaded on an individual computer. DOT computers were also occasionally accessed without the user's knowledge to retrieve a needed document, sometimes bypassing a password prompt to obtain access. The computer staff of the DOT provided technical support for Leventhal's DOT computer upon his request three or four times between 1994 and 1996, and once, after hours, without his request, in order to change the name of the server.
 
 
 10
 B. The Anonymous Letter to the Inspector General
 
 
 11
 On October 15, 1996, the New York State Office of the Inspector General referred to the DOT an anonymous letter it had received complaining of abuses at the DOT Accounting Bureau. This letter described specific employees by reference to their salary grades, genders, and job titles, without providing names. The letter made certain allegations concerning a grade 27 employee. Leventhal was the only grade 27 employee in the office at that time and, therefore, the DOT investigators inferred that the grade 27 employee described in the letter was Leventhal. The relevant portion of the letter states:
 
 
 12
 The abuse of time and power is so far out of line with the intended functions of the bureau that to cite all specifics would be an endless task. The day to day operation of this bureau is a slap in the face to all good state workers. You have to see this place to believe it. I will cite a few examples. A grade 27 who is late everyday. The majority of his time is spent on non-DOT business related phone calls or talking to other personnel about personal computers. He is only in the office half the time he is either sick or on vacation.... [Half the time of a grade 23] is spent playing computer games and talking on the phone to his family or talking sports to one his subordinates, the guy who sleeps at his desk.... A grade 18 with an apparent alcohol problem who is so incompetent that his supervisor allows him to sleep at his desk. The grade 27 is aware of this problem. When [the grade 18] is not sleeping he is playing computer games or drafting up letters which are typed by [another] grade 18, who is barely able to function at an entry level clerical position.... And the sad part is that management knows what is going on although they would deny it if you asked them.... I think its [sic] time for some new leadership in the bureau.
 
 C. The DOT Searches
 
 13
 Lawrence Knapek, the Assistant Commissioner of the DOT for the Office of Budget and Finance, met with John Samaniuk, the acting director of the Office of Internal Audit and Investigations, and Gary Cuyler, the chief investigator for that office, to discuss how to respond to the allegations made in the letter. They decided that the Office of Internal Audit and Investigation would conduct an investigation employing "such techniques as reviewing telephone records, reviewing computer records, Internet logs, that kind of thing." A "computer review" was ordered for all of the employees who could be identified from the letter. This involved printing out a list of file names found on these DOT computers to determine whether any contained non-standard software. After business hours on October 25, 1996, the investigators entered Leventhal's office through an open door, turned on his DOT computer, and reviewed the directories of files on the computer's hard drive. There was no power-on password to gain access to Leventhal's computer, but once the machine was turned on, some of the menu selections that appeared were password-protected. In order to perform their search, the investigators may have used a "boot-disk," a disk which allows the computer to start up without encountering the menus normally found there.
 
 
 14
 Having located the computer directories, the investigators printed out a list of the file names to enable the later identification of the programs loaded on Leventhal's computer without having to open each program. This included a printout of the names of the "hidden" files on Leventhal's computer. These "hidden" directories, the investigators found, contained "Morph," a type of drawing program and "PPU," a program suspected of containing tax software because of file names such as "TAX.FNT," and "CUSTTAX.DBF." On the non-"hidden" directories, the investigators found other non-standard software, including the programs Prodigy, Quicken, and Lotus Suite (although one part of Lotus Suite was standard DOT software at the time). Over the next two months, the investigators reviewed the computers of other management personnel of the Accounting Bureau, including the Accounting Bureau's director, John Chevalier, and three Grade 23 employees, Glenn Walker, John DeFrancesco, and Herbert Whitmarsh.
 
 
 15
 In February 1997, DOT management and investigators met to examine the results from these searches. Assistant DOT Commissioner Knapek attended the meeting and, aware of Leventhal's private tax practice, was particularly interested in confirming the investigators' suspicion that Leventhal had loaded tax software on his DOT office computer. They decided to conduct a further search of Leventhal's computer to determine with greater certainty whether the "PPU" directory they had discovered during the first search was part of a tax preparation program. Investigators reexamined the computer in Leventhal's office once in February 1997 and twice in April 1997. During these subsequent searches, they copied the "Morph" and "PPU" directories onto a laptop computer, obtained additional printouts of the file directories, and opened a few files to examine their contents. In the first April search, an investigator noticed that some items had been added to the PPU directory since the previous search, indicating recent activity. The PPU directory was later identified as belonging to "Pencil Pushers," a tax preparation program.
 
 
 16
 On May 2, 1997, shortly after informing Leventhal that he was under investigation and that the computer in his office would be confiscated, the Director of the DOT Employee Relations Bureau observed Leventhal appearing to delete items from his computer directories. Leventhal was then interrogated. He admitted to belonging to a group that had jointly purchased a single copy of the Pencil Pushers software that was then copied onto his computer and the computers of other members of the group. Leventhal also admitted that he had printed out up to five personal income tax returns from the computer in his DOT office.
 
 
 17
 D. The Disciplinary Proceeding Against Leventhal
 
 
 18
 In September 1997, the DOT brought disciplinary charges against Leventhal under N.Y. Civ. Serv. Law § 75 charging six grounds of misconduct or incompetence.[1] The DOT designated a private attorney as a hearing officer to take evidence and make recommendations to the Commissioner of the DOT, who would then review these recommendations and issue a decision in conformity with N.Y. Civ. Serv. Law § 75. The hearing officer began by holding a hearing concerning the admissibility of the evidence obtained during the DOT searches. On May 10, 1999, the hearing officer determined that the evidence acquired during the computer searches should be suppressed, finding that it had been obtained in violation of Leventhal's Fourth Amendment rights. The hearing officer notified the DOT Commissioner of his decision. In response, the Commissioner instructed the hearing officer to continue to take evidence, including all of the evidence obtained through the computer searches, and to forward to him the complete record, together with all of the hearing officer's recommendations. The hearing officer refused to comply with the request that he make the evidence from the searches part of the record. Three months later, on October 18, 1999, Leventhal settled with the DOT. As part of the settlement, the DOT agreed to withdraw all disciplinary charges except that of lateness, to which Leventhal pleaded guilty. As a result, Leventhal was penalized thirty work days leave without pay.
 
 
 19
 Between the time of the DOT searches of Leventhal's office computer and the time Leventhal was charged with misconduct, Leventhal was transferred from his position as Principal Accountant, a grade 27 position, to a position as the Supervisor of Agency Accounts, a grade 25 position. The DOT claims that this move was not precipitated by the disciplinary proceedings against Leventhal. Leventhal's 1994 promotion to his grade 27 position from a grade 25 position as Supervisor of Agency Accounts, was contingent on the ability of the person who had provisionally moved out of Leventhal's grade 27 position, John Chevalier, to retain the next highest position. Chevalier then failed to win permanent assignment to his higher-ranking position and, consequently, was moved back to the grade 27 position, forcing Leventhal back down to his former grade 25 position. Leventhal claims, however, that but for the disciplinary proceedings, the DOT would have created a special "663 position," akin to a grade 29 position, for Chevalier, allowing Leventhal to retain his grade 27 position.
 
 
 20
 In addition, on September 28, 1998, the DOT notified Leventhal that, due to the disciplinary charges pending against him, he would not be granted the 3.5% salary increase provided to most other management employees. At the option of the director of the budget, this salary increase could, by law, be withheld from any employee to reflect substandard job performance or when the increase was otherwise inappropriate. 1995 N.Y. Laws Ch. 314 § 3(11). Leventhal claims that he was denied this salary increase in retaliation for contesting the disciplinary charges against him.
 
 E. Leventhal's Suit Against the DOT
 
 21
 Four days after he settled the DOT disciplinary charges, Leventhal filed this action in United States District Court for the Northern District of New York (Norman A. Mordue, Judge). In his complaint, Leventhal alleged, under 42 U.S.C. § 1983: (1) Fourth Amendment violations arising out of the computer searches; and (2) Fourteenth Amendment due process violations resulting from his demotion and the denial of the salary increase.[2]
 
 
 22
 As a preliminary matter, the district court determined that the hearing officer's finding of a Fourth Amendment violation did not have preclusive effect on these proceedings. Regarding the propriety of the searches, the court found that Leventhal "could not reasonably expect complete privacy in the contents of his computer" because it was reasonable to expect "that other DOT employees might view the directory structure and other contents of his computer in his absence." Turning to the justification for the governmental intrusion, the district court concluded that the allegations in the anonymous letter were sufficient to give "rise to the reasonable suspicion that [Leventhal] was engaging in his private tax preparation business during work hours and that he might be using his computer in connection with that business" and that "an examination of the directory of the computer would produce evidence of work-related misconduct." On this basis, the court found that the scope of the initial search was reasonable and that the evidence discovered thereby justified the searches that followed. The district court rejected Leventhal's due process challenges to the DOT's failure to award him the 3.5% salary increase and his demotion to a grade 25 position, reasoning that Leventhal had no legal entitlement to either benefit.
 
 DISCUSSION
 A. Standard of Review
 
 23
 This Court reviews the grant of defendants' motion for summary judgment de novo, construing the evidence in the light most favorable to Leventhal as the non-moving party. See Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.1999), cert. denied, 529 U.S. 1098 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), and, therefore, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
 
 B. Leventhal's Fourth Amendment Claim
 
 24
 1. The Preclusive Effect of the Hearing Officer's Ruling
 
 
 25
 Absent specific statutory guidance from Congress, the preclusive effect of prior unreviewed state administrative determinations upon a subsequent suit in federal court is a matter of federal common law. See Univ. of Tenn. v. Elliott, 478 U.S. 788, 796-99 (1986) (fashioning common law rules for issue preclusion in suit under 42 U.S.C. § 1983). When federal common law gives preclusive effect in federal court to a state administrative determination, that prior determination has "the same preclusive effect to which it would be entitled in the State's courts." Id. at 799.
 
 
 26
 In this case, we need not reach the issue of whether federal common law would give preclusive effect to this state administrative determination because, even if it did, the action by the hearing officer would not have preclusive effect under New York law.[3] Under New York law, a state agency determination is given preclusive effect in a subsequent state court proceedings only when, inter alia, the identical issue, see Allied Chem. v. Niagara Mohawk Power Corp., 528 N.E.2d 153, 155 (N.Y. 1988), has "been decided in the prior action." Schwartz v. Public Adm'r of the Bronx, 246 N.E.2d 725, 729 (N.Y. 1969). In this case, the hearing officer's conclusion that Leventhal's Fourth Amendment rights were violated does not have preclusive effect because the issue was not "decided" in the agency proceeding. Leventhal and the DOT settled the disciplinary action before the hearing had concluded and the hearing officer's final recommendations had been forwarded to the DOT Commissioner for "review and decision." N.Y. Civ. Serv. Law § 75(2). Even if the hearing officer were to have completed taking the evidence and had offered recommendations, only the DOT Commissioner can make the agency determination. See Simpson v. Wolansky, 343 N.E.2d 274, 276 (N.Y. 1975) ("[T]he findings of the hearing officer [in a N.Y. Civ. Serv. Law § 75 proceeding] are not conclusive and may be overruled by the official upon whom has been imposed the power to remove or mete out the discipline."). Although Leventhal points to one case indicating that a hearing officer "receives and rules on evidence, keeps a record of the proceeding, and makes a recommendation to the disciplinary authority," Anderson v. Dolce, 653 F. Supp. 1556, 1563 (S.D.N.Y. 1987) (emphasis added), the same case notes that "[t]he disciplinary authority is not bound by the hearing officer's recommendation." Id. at 1563.
 
 
 27
 2. Public Employer Searches in Government Workplaces
 
 
 28
 "[T]he Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even when the Government acts as an employer." Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989). The "special needs" of public employers may, however, allow them to dispense with the probable cause and warrant requirements when conducting workplace searches related to investigations of work- related misconduct. See O'Connor v. Ortega, 480 U.S. 709, 719-26 (1987) (plurality opinion); id. at 732 (Scalia, J. concurring). In these situations, the Fourth Amendment's protection against "unreasonable" searches is enforced by "a careful balancing of governmental and private interests." New Jersey v. T.L.O., 469 U.S. 325, 341 (1985) (discussing the reasonableness of a search in the absence of a warrant and probable cause). A public employer's search of an area in which an employee had a reasonable expectation of privacy is "reasonable" when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of" its purpose. O'Connor, 480 U.S. at 726 (plurality opinion) (internal quotation marks omitted).
 
 
 29
 We begin by inquiring whether "the conduct... at issue... infringed an expectation of privacy that society is prepared to consider reasonable." Id. at 715 (plurality opinion) (internal quotation marks omitted). Without a reasonable expectation of privacy, a workplace search by a public employer will not violate the Fourth Amendment, regardless of the search's nature and scope. The workplace conditions can be such that an employee's expectation of privacy in a certain area is diminished. See id. at 717-18 (plurality opinion) (recognizing that offices that are "continually entered by fellow employees and other visitors during the workday for conferences, consultations, and other work-related visits," can be "so open to fellow employees or the public that no expectation of privacy is reasonable."); id. at 737 (Blackman, J., dissenting) ("[I]n certain situations, the `operational realities' of the workplace may remove some expectation of privacy on the part of the employee."). On the facts of O'Connor, the entire Court found a reasonable expectation of privacy with respect to the office desk and file cabinets in which the plaintiff had maintained his personal correspondence, medical files, correspondence from private patients unconnected with his employment, personal financial records, teaching aids and notes, and personal gifts and mementos. Id. at 718 (plurality opinion); id. at 731 (Scalia, J., concurring); id. at 732 (Blackmun, J., dissenting). In finding that the plaintiff had a reasonable expectation of privacy, the plurality noted that there was no evidence that the employer had "established a[ ] reasonable regulation or policy discouraging employees... from storing personal papers and effects in their desks or file cabinets." Id. at 719 (plurality opinion).
 
 3. Leventhal's Expectation of Privacy
 
 30
 We hold, based on the particular facts of this case, that Leventhal had a reasonable expectation of privacy in the contents of his office computer. We make this assessment "in the context of the employment relation," id. at 717 (plurality opinion), after considering what access other employees or the public had to Leventhal's office.
 
 
 31
 Leventhal occupied a private office with a door. He had exclusive use of the desk, filing cabinet, and computer in his office. Leventhal did not share use of his computer with other employees in the Accounting Bureau nor was there evidence that visitors or the public had access to his computer.
 
 
 32
 We are aware that "[p]ublic employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." Id. Construing the evidence in favor of Leventhal, as we must in reviewing this grant of summary judgment against him, we do not find that the DOT either had a general practice of routinely conducting searches of office computers or had placed Leventhal on notice that he should have no expectation of privacy in the contents of his office computer. Cf. United States v. Simons, 206 F.3d 392, 398 (4th Cir. 2000) (finding no legitimate expectation of privacy in Internet use when employer's known policy allowed monitoring of "all file transfers, all websites visited, and all e-mail messages"); Sheppard v. Beerman, 18 F.3d 147, 152 (2d Cir. 1994) (finding no legitimate expectation of privacy in office, desk, and file cabinets in light of the "unique" relationship between a judge and her law clerk necessitating a "distinctive open access to documents").
 
 
 33
 Viewing the DOT anti-theft policy in the light most favorable to Leventhal, we find that it did not prohibit the mere storage of personal materials in his office computer. Rather, the anti-theft policy prohibited "using" state equipment "for personal business" without defining further these terms. John Samaniuk, acting director of the DOT's Office of Internal Audits and Investigations, testified at Leventhal's disciplinary hearing that an employee would not violate state policies by keeping a personal checkbook in an office drawer, even though it would take up space there. Under the circumstances presented here, we cannot say that the same anti-theft policy prohibited Leventhal from storing personal items in his office computer. See O'Connor, 480 U.S. at 719 (plurality opinion) (finding "a reasonable expectation of privacy at least in [an office] desk and file cabinets").
 
 
 34
 Although the DOT technical support staff had access to all computers in the DOT offices, their maintenance of these computers was normally announced and the one example in the record of an unannounced visit to Leventhal's computer was only to change the name of a server. DOT personnel might also need, at times, to search for a document in an unattended computer, but there was no evidence that these searches were frequent, widespread, or extensive enough to constitute an atmosphere "so open to fellow employees or the public that no expectation of privacy is reasonable." Id. at 718 (plurality opinion). This type of infrequent and selective search for maintenance purposes or to retrieve a needed document, justified by reference to the "special needs" of employers to pursue legitimate work-related objectives, does not destroy any underlying expectation of privacy that an employee could otherwise possess in the contents of an office computer. The Supreme Court has concluded that "`[c]onstitutional protection against unreasonable searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer.'" Id. at 717-18 (plurality opinion quoting concurring opinion of Scalia, J) (emphasis in original).[4]
 
 4. The Nature and Scope of the Searches
 
 35
 Even though Leventhal had some expectation of privacy in the contents of his office computer, the investigatory searches by the DOT did not violate his Fourth Amendment rights. An investigatory search for evidence of suspected work-related employee misfeasance will be constitutionally "reasonable" if it is "justified at its inception" and of appropriate scope. Id. at 726 (plurality opinion); see also T.L.O. 469 U.S. at 342 (finding search permissible in its scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of... the nature of the [misconduct]"). We agree with the district court that both of these requirements are satisfied here.
 
 
 36
 The initial consideration of the search's justification examines whether "there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." O'Connor, 480 U.S. at 726 (plurality opinion). Here, there were reasonable grounds to believe that the searches would uncover evidence of misconduct. The specific allegations against the grade 27 employee, who was reasonably assumed to be Leventhal, were that (1) he was "late everyday"; (2) he spent "[t]he majority of his time... on non-DOT business related phone calls or talking to other personnel about personal computers"; and that (3) "[h]e is only in the office half the time[; the other half] he is either sick or on vacation." Probable cause is not necessary to conduct a search in this context, a plurality of the Court has explained, because "public employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner." Id. at 724 (plurality opinion). The individualized suspicion of misconduct in this case justified the DOT's decision to instigate some type of search.[5]
 
 
 37
 The scope of a search will be appropriate if "reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct." Id. at 726 (plurality opinion) (alterations omitted). We conclude that the DOT search to identify whether Leventhal was using non-standard DOT software was "reasonably related" to the DOT's investigation of the allegations of Leventhal's workplace misconduct. Although the anonymous letter did not allege that the grade 27 employee was misusing DOT office computers, it did allege that the grade 27 employee was not attentive to his duties and spent a significant amount of work time discussing personal computers with other employees. Furthermore, the letter's allegations assumed that the DOT prohibition against misusing office computers was not rigorously enforced in the Accounting Bureau, remarking that a grade 18 employee "play[ed] computer games," that a grade 23 employee spent a substantial part of the day "playing computer games" or in non-work related conversations, and that another grade 23 employee "amuses himself by learning about computer software which have nothing to do with work." In view of the allegations of the misuse of DOT computers among other employees in the Accounting Bureau, Leventhal's alleged penchant for discussing personal computers during work hours, and Leventhal's general inattention to his duties which included, we presume, supervision of the computer use of others, we find that the searches of his computer were "reasonably related" to the DOT investigation of allegations of Leventhal's workplace misconduct.
 
 
 38
 Leventhal argues that a search for non-standard software would be irrelevant to charges of misconduct because the DOT had, de facto, approved of the use of non-standard software needed to conduct DOT business. Even assuming that this were true, the investigation was more broadly aimed at uncovering evidence that Leventhal was using his office computer for non-DOT purposes. The searches accomplished this task by uncovering evidence that Leventhal had loaded a tax preparation program onto his office computer, a program that he later admitted he used to print out personal tax returns in his office.
 
 
 39
 We also find that the scope of the searches was not "excessively intrusive in light of the nature of the misconduct." Id. at 726 (plurality opinion) (internal quotation marks and ellipsis omitted). During the first search, the DOT investigators printed out a list of file names found on Leventhal's office computer. They did not run any program or open any files. The investigators entered Leventhal's office through an open door and found that Leventhal's computer had no power-on password although some menu selections were password protected. The investigators limited their search to viewing and printing file names that were reasonably related to the DOT's need to know whether Leventhal was misusing his office computer. The first search was permissible in scope.
 
 
 40
 Neither were the three subsequent searches "excessively intrusive." After the first search had established that files named "TAX.FNT" and "CUSTTAX.DBF" were loaded on Leventhal's computer, the investigators reasonably suspected that these files were part of a tax program. When DOT investigators and management met to discuss what they had found in the first search, Assistant Commissioner Knapek expressed a particular interest in confirming whether Leventhal had loaded tax preparation software on his DOT computer, aware that Leventhal had a private tax practice. Investigators reexamined the computer in Leventhal's office once in February 1997 and twice in April 1997. These searches were limited to copying onto a laptop computer the "PPU" directories that they later identified as referring to "Pencil Pushers," a tax preparation program, and the "Morph" directories, pertaining to a graphics program, to printing out additional copies of the file names, and to opening a few files to examine their contents. There is no evidence that the DOT opened and examined any computer files containing individual tax returns that may have been saved on Leventhal's computer, and, therefore, we need not address the permissibility of searching such materials. Considering that the first search yielded evidence upon which it was reasonable to suspect that a more thorough search would turn up additional proof that Leventhal had misused his DOT office computer, the DOT investigators were justified in returning to confirm the nature of the non-standard DOT programs loaded on Leventhal's computer by copying directories, printing file names, and opening selected files.[6]
 
 C. Leventhal's Due Process Claim
 
 41
 Leventhal claims that when the DOT demoted him and failed to award him a salary increase, it did so without the due process guaranteed to him by the Fourteenth Amendment. This claim fails because Leventhal did not possess a property or liberty interest protected by the Due Process Clause in either his former job grade or the salary increase.
 
 
 42
 In order to be protected by the Constitution against the deprivation of a government benefit without due process of law, a claimant must have a "legitimate claim of entitlement to it." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). The expectation of entitlement is typically derived from "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits." Id.; see also Bernheim v. Litt, 79 F.3d 318, 322 (2d Cir. 1996) ("To state a cause of action under the [D]ue [P]rocess [C]lause, a plaintiff must show that she has a property interest, created by state law, in the employment or the benefit that was removed.").
 
 1. Salary Increase
 
 43
 Leventhal's discretionary salary increase was not a form of property protected by the Constitution against deprivation without due process of law. On September 28, 1998, the DOT notified Leventhal that, because of the pending disciplinary charges against him, he would not receive the 3.5% salary increase granted to most other management employees. The salary increase could, by law, be withheld from any employee who, in the opinion of the director of the budget, had substandard job performance or when the increase was otherwise unwarranted. 1995 N.Y. Laws Ch. 314 § 3(11).[7]
 
 
 44
 Because Leventhal cannot satisfy the threshold requirement that the salary increase was his "property," the claim that he was deprived of the increase without due process of law must fail. See Bernheim, 79 F.3d at 323 ("[W]here the complained-of conduct concerns matters that are within an official's discretion, entitlement to that benefit arises only when the discretion is so restricted as to virtually assure conferral of the benefit.").
 
 2. Demotion From Grade 27 to Grade 25
 
 45
 Similarly, Leventhal's demotion from a grade 27 to a grade 25 position was not offensive to the Due Process Clause of the Fourteenth Amendment. Leventhal concedes that his former grade 27 position as Principal Accountant was a "contingent permanent" position whose security depended upon John Chevalier, the person who had formerly occupied this position, being hired permanently at the grade 29 position of Director of Transportation Accounting and Fiscal Services. Leventhal was moved back to his former grade 25 position after Chevalier retreated to his former position as Principal Accountant.
 
 
 46
 Leventhal argues that the DOT could have kept both him and Chevalier at their former pay grades if the DOT had created a special "663" position - equivalent to a grade 29 position - for Chevalier after Chevalier failed to win appointment as permanent chief of the Accounting Section. This argument suffers from the same infirmity already discussed. Even assuming that Leventhal had standing to challenge the DOT's failure to create a job for Chevalier, the DOT has not conferred on someone in Chevalier's situation a right to having a special "663" position created whenever that employee fails to win the permanent placement desired. As a result, the DOT's failure to create such a position in this case did not deprive Chevalier and, consequently, Leventhal, of any property interest protected by the Due Process Clause.
 
 
 47
 Additionally, Leventhal implies that his constitutional liberty interest was harmed because his demotion "`impose[d] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities or that might seriously damage his standing and associations in his community.'" Brief of Plaintiff at 37 (quoting Roth, 408 U.S. at 573). On appeal, however, Leventhal has not specified anything within the allegedly stigmatizing material that is arguably false. This omission proves fatal to his claim. See Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir. 1980) ("[T]o constitute deprivation of a liberty interest, the stigmatizing information must be both false and made public by the offending governmental entity.") (internal quotation marks and ellipses omitted).
 
 CONCLUSION
 
 48
 Because the DOT searches of Leventhal's office computer were not "unreasonable" under the Fourth Amendment, and the DOT's demotion of Leventhal and its failure to grant him a salary increase were not deprivations of property or liberty warranting constitutional protection under the Fourteenth Amendment, we affirm the district court's grant of summary judgment to defendants, denial of Leventhal's cross-motion for summary judgment, and dismissal of the complaint.[8]
 
 
 
 NOTES:
 
 
 [1]
 The grounds were (1) lateness; (2) improper use of an office computer by installing non-standard personal software programs in violation of the DOT anti-theft policy; (3) improper business relationships between a subordinate and his superior in purchasing and sharing the cost of the Pencil Pushers software in violation of the DOT's conflict of interest policy; (4) improper use of DOT computer equipment in printing tax returns of private clients in violation of the DOT anti-theft policy; (5) interference with the DOT disciplinary investigation by deleting computer files from an office computer after being informed that the computer would be confiscated; and (6) violation of copyright infringement laws by the unlicensed installation and maintenance of the Pencil Pushers software on a DOT office computer subjecting the DOT to potential liability for copyright infringement.
 
 
 [2]
 By his failure to pursue them on appeal, we find that Leventhal has waived other claims made in his complaint. These include claims made under (1) the First Amendment; (2) the Equal Protection Clause of the Fourteenth Amendment; (3) the Fifth Amendment; (4) 42 U.S.C. § 1985; and (5) N.Y. Civ. Serv. Law § 75, independent of the Fourth Amendment search and seizure and Fourteenth Amendment due process brought under 42 U.S.C. § 1983 and discussed in this opinion. Leventhal has not challenged on appeal and, therefore, we conclude has abandoned any opposition to the district court's decision to bar, under the Eleventh Amendment, any claims for monetary damages against the DOT and individual defendants sued in their official capacity.
 
 
 [3]
 In Elliott, the Supreme Court found that preclusion applies in federal court "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." Elliott, 478 U.S. at 789 (internal quotation marks and ellipsis omitted and emphasis added). Neither the Supreme Court nor this Court has decided whether preclusion would similarly apply in a suit under 42 U.S.C. § 1983 for an issue of law or a mixed question of law and fact resolved by the state agency such as those involved in the suppression of evidence under the Fourth Amendment. See Doe v. Pfrommer, 148 F.3d 73, 80 (2d Cir.1998) ("Currently, this circuit has not taken a position regarding the split in the circuits as to whether to give preclusive effect to the unreviewed legal determinations of state administrative decisions."). For purposes of this discussion we will assume, without deciding, that preclusion could apply under these circumstances to the unreviewed decision of a state administrative agency to exclude evidence it believed was obtained in violation of the Fourth Amendment.
 
 
 [4]
 Despite the split in the O'Connor court on other matters, there appears to be unanimity surrounding this principle. Justice Scalia, concurring in the judgment, would have gone further to declare that "the offices of government employees... are covered by Fourth Amendment protections as a general matter" except in unusual situations such as when "the office is subject to unrestricted public access." Id. at 731. The plurality opinion recognized that the presumption of workplace privacy could be defeated not only by public access by also when offices are "so open to fellow employees... that no expectation of privacy is reasonable." Id. at 718. Nevertheless, the plurality opinion quoted Justice Scalia's concurrence approvingly in stating that searches justified by an employer's special needs do not extinguish the underlying expectation of privacy. Id. at 717. The four dissenting justices similarly quoted with approval Justice Scalia's formulation. Id. at 738.
 
 
 [5]
 We do not reach the issue of whether a search would have been justified in the absence of individualized suspicion. See O'Connor, 480 U.S. at 726 ("Because petitioners had an `individualized suspicion' of misconduct by [the plaintiff], we need not decide whether individualized suspicion is an essential element of the standard of reasonableness that we adopt today.").
 
 
 [6]
 On appeal, Leventhal has not pressed a claim that his constitutional rights were violated by the DOT seizure of his office computer and its contents on May 2, 1997. Accordingly, we find that any such claim has been abandoned.
 
 
 [7]
 The enactment provided, in relevant part, that:
 [A]ny increase in compensation provided by this section... may be withheld in whole or in part from any officer or employee when in the opinion of the director of the budget, such withholding is necessary to reflect the job performance of such officer or employee, or to maintain appropriate salary relationships among officers of employees of the state, or to reduce state expenditures to acceptable levels or, when in the opinion of the director of the budget, such increase is not warranted or is not appropriate and the salary of such officer or employee is set at the discretion of the appointing authority.
 1995 N.Y. Laws Ch. 314 § 3(11).
 
 
 [8]
 Accordingly, we also deny Leventhal's request under 42 U.S.C. § 1988 for attorneys' fees.