**Robin BROWN–CRISCUOLO, Plaintiff,**

v.

**Robert K. WOLFE, Defendant.**

No. 3:05CV01486 (DJS).

United States District Court,
D. Connecticut.

March 9, 2009.

Eric T. Dean, Jr., Shelley A. Marcus, The Marcus Law Firm, John R. Williams, New Haven, CT, for Plaintiff.

Alexandria L. Voccio, David S. Monastersky, Howd & Ludorf, Hartford, CT, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Robin Brown–Criscuolo ("the Plaintiff") brings this action against the defendant, Robert K. Wolfe ("the Defendant"), alleging that the Defendant violated the First, Fourth, and Fourteenth Amendments to the United States Constitution, the Stored Communications Act, 18 U.S.C. §§ 2701–2707, the Wiretap Act, 18 U.S.C. §§ 2510–2511, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.* The Plaintiff also alleges that the Defendant intentionally or recklessly subjected her to emotional distress and invaded her privacy. The Defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that hereafter follow, the Defendant's motion for summary judgment (dkt. #30) is **GRANTED in part and DENIED in part.**

### I. FACTS

The Plaintiff is an educator with over 37 years of service. She holds a bachelor's degree in elementary education, a master's degree in Special Education, and a 6th year diploma in administration. She has also received training for the position of superintendent. For approximately 6 years, the Plaintiff taught as a classroom teacher. She subsequently became a Special Education Resource Person who trained special education teachers and oversaw special education programs. In addition, the Plaintiff was a Supervisor of Special Education in the Cheshire public school system. As a Supervisor in the Cheshire public school system, she worked

as an interim principal and Curriculum Coordinator at the central office. Then, in 1986, she was hired at the North Branford school district and worked as principal at the Stanley T. Williams School for approximately 12 years.

In 1998, the Plaintiff became the principal of the Jerome Harrison School in North Branford, Connecticut. Her responsibilities included not only the day-to-day duties of a principal, but also the supervision of the special education program. It was the Plaintiff's responsibility to ensure that special education laws and procedures were implemented and followed, and if she saw any violations of a student's rights or failure to follow proper procedure, she was obligated to bring such problems to the attention of the Superintendent of Schools in North Branford. In addition, the Plaintiff helped identify problem students in the regular classroom and provided in-service training for teachers. This training included research-based reading instruction, classroom modification, and behavior management plans.

For the children whose problems persisted, she facilitated a referral to a so-called START team ("START"), which was comprised of the principal, social workers, reading consultants, the school psychologist, and speech and language personnel. START would develop a plan for the children with problems and help the classroom teacher implement an education plan. START met weekly to discuss students who were having difficulties and not making progress. If the START plan did not work, the Plaintiff (or others, such as teachers or parents) could then refer the child to the Planning and Placement Team ("PPT"), which could authorize further testing. After 45 days, the PPT would meet and determine whether a particular child was learning disabled, and if he would qualify for special education services.

The Defendant became the Superintendent of Schools in North Branford in March of 2001, and is currently working in that capacity. As North Branford's Superintendent of Schools, the Defendant was the Plaintiff's supervisor. After becoming the Superintendent of Schools, the Defendant hired Suzanne Wright ("Wright") to be the new Director of Special Education. In this position, Wright implemented new policies that, according to the Plaintiff, were in direct violation of state and federal special education laws. One of these policies the Plaintiff disagreed with was that teachers and principals were not to refer a child to the START program without prior approval from Wright. Wright also requested that students be involved in the START program for at least six weeks before a PPT referral would be allowed. Additionally, Wright, instead of the PPT, now decided which students were to be given services and which students were designated special education students. Wright informed the teachers which tests could be given, decided whether a student's profile would make a student eligible for services, and allowed only existing services that could be recommended at a PPT.

The Plaintiff believed that, because of the policies implemented by Wright, PPT members were afraid, intimidated or discouraged from obtaining the proper evaluations and/or services for students. Therefore, the Plaintiff concluded that students were being denied access to programs to which they were legally entitled. On February 22, 2004, the Plaintiff wrote a letter to the Defendant regarding her problems in working with Wright and her inability to effectively do her job in light of the restraints now placed upon her.

In February of 2004, the PPT put a particular child in special education. The parties dispute what subsequently oc-

curred. The Plaintiff alleges that the Defendant summoned her into his office and accused her of performing illegal activities. According to the Plaintiff, she then contacted the Connecticut Department of Education ("DOE") to find out if what she had done was illegal, and the DOE informed her that it was not. The Plaintiff maintains that the Defendant responded by telling the Plaintiff that she was not allowed to call DOE to check on local mandates. The Plaintiff also maintains that the Defendant then had the Plaintiff call a staff meeting on April 7, 2004 so that he could inform the staff that she had done something illegal. As the Plaintiff recalls the staff meeting, the Defendant shouted and berated her in front of the teachers and staff. The Defendant, for his part, asserts that he attended the staff meeting, during which he addressed the faculty about the START process that must be followed. According to the Defendant, he did not at all criticize the Plaintiff during that meeting.

In August 2004, after a cap was placed on the class size at the school, the Plaintiff called the principal of Totoket Valley School and told her that, per the Defendant's instructions, she was sending a student to her school. Almost immediately, the Defendant called the Plaintiff and denied telling her to send children to Totoket Valley School.

In September 2004, a student at the Plaintiff's school named Matthew began to exhibit behavior problems. The Plaintiff requested assistance from the Defendant, who provided a substitute teacher for a limited time. The Plaintiff remained concerned that more needed to be done. Matthew subsequently bit an aide at the school.

On another occasion, the Plaintiff allegedly informed Wolfe that any attempt to get an initial PPT for a student named Michael was being delayed by Wright.

The Plaintiff claims she warned the Defendant that this particular case would come back to "bite them in the ass" if they did not act on it. The Defendant allegedly ignored her requests. Eventually, Michael's parents went to the DOE and filed a complaint against the school, demanding reimbursement for the tutoring and related costs for services that the school district had failed to give the child.

In January 2005, the Defendant had Attorney Marsha Moses ("Attorney Moses") conduct an investigation into the handling of Michael's case. On February 22, 2005, Attorney Moses issued her findings, in which she determined that there were numerous procedural violations concerning the handling of the special education referral and evaluation process. The Defendant then responded by informing the Plaintiff that the special education budget was "in the red," and, therefore, any payment to Michael's parents would have to come from her school's budget.

The Plaintiff went out on an extended medical leave on January 31, 2005. On March 29, 2005, the Defendant was notified that the Plaintiff would remain out of work for a gastrointestinal problem at least until her next medical appointment, which was scheduled for July 2005. Neither the Plaintiff nor her doctor provided an explanation as to why the this next appointment was more than three months away. The Defendant claims that the Plaintiff provided only minimal information regarding her condition and expected return to work date. The Plaintiff maintains that she provided the necessary information, and that her doctor cooperated with the school district's doctor upon request. The Defendant asserts that he wanted more definitive information regarding the Plaintiff's condition, and thus had the Plaintiff undergo an independent medical

examination from Dr. Myron Brand ("Dr. Brand"), a gastroenterologist.

On May 14, 2005, Dr. Brand issued a report indicating that the Plaintiff's health problems were psychiatric, not gastrointestinal, and that she should not return to work until she had been cleared by her psychiatrist. Consequently, the Plaintiff was sent to Dr. Mark Rubenstein ("Dr. Rubenstein"), a psychiatrist, for an examination. In a report dated June 2, 2005, Dr. Rubenstein concluded that the Plaintiff's psychiatric prognosis was "excellent," and that she could return to work. On June 10, 2005, the Plaintiff called the Defendant and indicated that she wanted to return to work. The Defendant agreed, and the Plaintiff returned to work on June 13, 2005.

While the Plaintiff was out on medical leave, Christine Imperato ("Imperato"), the middle school assistant principal, initially stepped in as acting principal. Beginning on April 1, 2005, the Defendant assumed the role of acting principal, and remained in that position until the Plaintiff returned to work. The parties dispute the Defendant's conduct during his time as acting principal, specifically his conduct with regard to the Plaintiff's emails. The Plaintiff alleges that the Defendant used the Plaintiff's work computer and looked at her emails without her permission. The Plaintiff further alleges that the Defendant forwarded to his own email account an email containing a letter, dated January 25, 2005, the Plaintiff had sent to her attorney, Howard Klebanoff ("Attorney Klebanoff"). In this letter to Attorney Klebanoff, the Plaintiff described certain work-related problems she was having with the Defendant.

The Defendant, for his part, maintains that he accessed the Plaintiff's email account to review school-related messages, and he did not view any emails that were clearly identifiable as personal. The Defendant further maintains that he thought the email to Attorney Klebanoff was school-related because it was his belief that Attorney Klebanoff was a special education lawyer. The parties agree that on April 11, 2005, the email (with the letter attachment) was forwarded to the Defendant's email account, and opened and saved on the Defendant's computer.[1]

The Plaintiff filed this action on September 22, 2005, alleging that the Defendant's conduct violated her rights in several respects. The Plaintiff retired from the Jerome Harrison School in January 2007.

## II. DISCUSSION

The Defendant now moves for summary judgment, arguing that the Plaintiff's claims fail as a matter of law. The Plaintiff argues that there are genuine issues of material fact precluding summary judgment. The Court shall discuss the parties' arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an

---

1. The Plaintiff filed a criminal complaint against the Defendant, claiming that he had committed a computer crime. From what the Court can discern in the record, it was determined that there was no probable cause to continue the investigation, and no criminal charges were brought against the Defendant.

essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. WITHDRAWN CLAIMS

In her complaint, the Plaintiff alleged violations of the Stored Communications Act, the Wiretap Act, the Rehabilitation Act, and the Equal Protection Clause of the Fourteenth Amendment. The Court need not discuss these claims, however, because the Plaintiff, in her opposition memorandum, has notified the Court that she no longer wishes to pursue these claims. Consequently, with regard to the Plaintiff's claims under the Stored Communications Act, the Wiretap Act, the Rehabilitation Act, and the Equal Protection Clause of the Fourteenth Amendment, the

Defendant's motion for summary judgment (**dkt. # 30**) is **GRANTED.**

## C. FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution reads as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[2] "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). "[I]n order to claim the protection of the Fourth Amendment, a [claimant] must demonstrate that [s]he personally has an expectation of privacy in the place searched, and that h[er] expectation is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (internal quotation marks omitted).

"[T]he Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even when the Government acts as an employer." *Leventhal v. Knapek,* 266 F.3d 64, 73–73 (2d Cir.2001) (internal quo-

---

**2.** As the Supreme Court has noted, "[t]he Fourth Amendment's search and seizure provisions are applicable to [state] defendants through the Fourteenth Amendment's Due Process Clause." *Tenenbaum v. Williams,* 193 F.3d 581, 602 n. 14 (2d Cir.1999) (citing *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)).

tation marks omitted). "The 'special needs' of public employers may, however, allow them to dispense with the probable cause and warrant requirements when conducting workplace searches related to investigations of work-related misconduct." *Id.* at 73 (citing *O'Connor v. Ortega*, 480 U.S. 709, 719–26, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion); *id.* at 732, 107 S.Ct. 1492 (Scalia, J. concurring)). "In these situations, the Fourth Amendment's protection against unreasonable searches is enforced by a careful balancing of governmental and private interests." *Id.* (internal quotation marks omitted). "A public employer's search of an area in which an employee had a reasonable expectation of privacy is 'reasonable' when 'the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of' its purpose." *Id.* (quoting *O'Connor*, 480 U.S. at 726, 107 S.Ct. 1492).

1. Reasonable Expectation of Privacy

██ The Court must first look at whether the Defendant's conduct infringed an expectation of privacy that society would consider reasonable because "[w]ithout a reasonable expectation of privacy, a workplace search by a public employer will not violate the Fourth Amendment, regardless of the search's nature and scope." *Id.* With regard to email communications in general, the Court notes that, "[al]though e-mail communication, like any other form of communication, carries the risk of unauthorized disclosure, the prevailing view is that ... confidential information [may be communicated] through unencrypted e-mail with a reasonable expectation of confidentiality and privacy." *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 256 (Bankr.S.D.N.Y.2005) (collecting authorities). In determining whether an employee had an expectation of privacy in emails sent or received on her employer's computer or email system, the Court should consider the following four factors:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*Id.* at 257–58; *see Geer v. Gilman Corp.*, No. 3:06 CV 889(JBA)(JGM), 2007 WL 1423752, at *3 (D.Conn. Feb. 12, 2007) Thus, the Court must look at the specific circumstances here.

For the time period relevant to this case, the North Branford School District had an Acceptable Use Policy ("AUP"), which controlled the use of the North Branford School District's computer system. Under the AUP, the Plaintiff, as an employee, was provided with her own individual email account. (*See* dkt. # 30, Ex. I, Part D.5.) It is undisputed that the Plaintiff had a password to her account, and that this password was not widely known, as apparently only the Plaintiff and the computer system's administrator had it. In addition, the terms of the AUP do not grant total privacy to users, nor do they abrogate all privacy. Instead, the AUP states that "[s]ystem users have a limited privacy expectation in the contents of their personal files on the District system." (*Id.*, Part H.1.) Thus, "[r]outine maintenance and monitoring of the system may lead to discovery that the user has or is violating the District [AUP], the district disciplinary code, or the law." (*Id.*, Part H.2.) In addition, "[a]n individual search will be conducted if there is reasonable suspicion that a user has violated the law or the district disciplinary code." (*Id.*, Part H.3.) Furthermore, the AUP puts employees on notice that "their personal

files may be discoverable under CT State public records laws." (*Id.,* Part H.4.) Nonetheless, the AUP prohibits users from "attempt[ing] to gain unauthorized access to the [system] or . . . go[ing] beyond their authorized access[,] . . . . includ[ing] attempting to log in through another person's account or using an open account (not logged off) to access a computer or access another person's files." (*Id.,* Part L.2.a.).

In the Court's view, the Plaintiff did have a reasonable expectation of privacy in her emails at work, and the Court is not convinced by the Defendant's arguments to the contrary. The Defendant argues that the computer system was to be used for educational and professional or career development activities. This is a correct reading of the AUP. The email and letter attachment in question, however, appear to relate to these types of activities, as they constitute communications to her lawyer expressing the Plaintiff's concerns and worries about certain aspects of her job. (*See id.,* Ex G.)

The Defendant also argues that, because the AUP allows for "routine maintenance and monitoring" of the system, the Plaintiff, who was aware of this policy, could not have had a reasonable expectation of privacy in her email account. The Court is not persuaded by this argument, though, because the record does not indicate that it was actually the practice of the North Branford School District to routinely monitor system users' email accounts. The Court also does not see any evidence showing that it would be the duty of the superintendent (i.e., the Defendant), rather than

the computer system's administrator, to conduct such routine maintenance and monitoring. Moreover, the Defendant does not claim that he accessed the Plaintiff's email account pursuant to his normal routine of maintaining and monitoring the computer system. The Defendant instead alleges that he accessed the email account because of a specific, particular circumstance, namely, the Plaintiff's medical leave. Indeed, from what the Court can discern in the record, it appears that the Defendant had some difficulty in accessing the Plaintiff's email account because it was protected by a password [3] and not generally accessible to people other than the Plaintiff. In light of this, the Court fails to see how the Defendant's conduct was part of a routine of maintenance and monitoring the computer system.[4]

The Defendant further argues that because the AUP advised employees that their personal files were potentially discoverable under public records laws, the Plaintiff could not have had a reasonable expectation of privacy in her email account. This argument does not persuade the Court for the simple reason that the Defendant's did not act pursuant to any such law. There is nothing in the record indicating that a request was made under any public records law to search the Plaintiff's personal files, let alone that the Defendant was acting pursuant to such a request. Therefore, given these circumstances, the Court concludes that the Plaintiff did have a reasonable expectation of privacy in her email account.

---

**3.** It seems that only the Plaintiff (or only the Plaintiff and the computer system's administrator) knew this password. Not even the Plaintiff's secretary knew the email account password.

**4.** There is no assertion from the Defendant that he searched the Plaintiff's email account

because he held a reasonable suspicion that she had violated the law or the school district's disciplinary code. In addition, there is no indication that the Defendant, in accessing the Plaintiff's email account, discovered anything that would constitute such a violation.

### 2. The Nature and Scope of the Search

Even if a plaintiff has a reasonable expectation of privacy in the workplace, "[a]n investigatory search for evidence of suspected work-related employee misfeasance will be constitutionally 'reasonable' if it is 'justified at its inception' and of appropriate scope.'" *Leventhal*, 266 F.3d at 75 (quoting *O'Connor*, 480 U.S. at 726, 107 S.Ct. 1492). "The initial consideration of the search's justification examines whether 'there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct.'" *Id.* (quoting *O'Connor*, 480 U.S. at 726, 107 S.Ct. 1492). Then the Court must look at the scope of the search, which "will be appropriate if 'reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct.'" *Id.* (quoting *O'Connor*, 480 U.S. at 726, 107 S.Ct. 1492).

■ With regard to the initial consideration, namely, whether there were reasonable grounds for conducting the search, the Court notes that the Defendant did not conduct the search because he thought he would find evidence of wrongdoing. This makes the Court doubtful of whether the search could be considered reasonable at all. The Defendant does argue, however, that the search was necessary because he wanted to ensure that no important emails sent to the Plaintiff were overlooked on account of her medical leave.

Assuming, for the sake of argument, that the Defendant's alleged motive for conducting the search of the Plaintiff's email account could constitute a reasonable ground for doing so, the Court is not convinced that the scope of that search was appropriate. The Defendant admits that he read the email with the attached letter the Plaintiff had written to Attorney Klebanoff, who was the Plaintiff's private attorney. The Court believes that a reasonable finder of fact could find that the Defendant should have immediately realized that this communication was not relevant to the alleged purpose of his search of the Plaintiff's email account. The Defendant claims that he was simply making sure that no important emails sent to the Plaintiff were overlooked on account of her absence. A reasonable finder of fact could conclude that reading a communication that was not sent to the Plaintiff, but was rather sent by the Plaintiff, does not fall under the scope of the search.

Moreover, this communication was somehow forwarded to the Defendant's own email account. It is not readily apparent to the Court how the forwarding this communication to the Defendant's email account would be related to the objectives of Defendant's search. The Court believes that a reasonable finder of fact could find such conduct to be excessively intrusive. While the Defendant claims that it was not he who forwarded the communication to his email account, there is, at least, a factual question as to how it happened. Consequently, with regard to the Plaintiff's Fourth Amendment search and seizure claim, the Defendant's motion for summary judgment (**dkt. # 30**) is **DENIED.**

### D. FIRST AMENDMENT RETALIATION

■ The Plaintiff also alleges that the Defendant retaliated against her because she exercised her First Amendment right to free speech. As the Second Circuit has held,

> a plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse em-

ployment determination against him, so that it can be said that his speech was a motivating factor in the determination. *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999); *see Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If a plaintiff produces evidence of these three elements, the government may nevertheless escape liability in one of two ways. "One way the government may prevail is by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. County of Suffolk* 316 F.3d 368, 382 (2d Cir.2003). "Alternatively, the government may show that plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." *Id.* at 382–83. (internal quotation marks omitted.) "The question of whether certain speech enjoys a protected status under the First Amendment is one of law, not fact." *Morris,* 196 F.3d at 110.

■ Before the Court reaches these issues, however, it must first address a preliminary question—whether the Plaintiff expressed his views as a citizen, or as a public employee pursuant to his official duties. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423, 126 S.Ct. 1951. "When a public employee speaks pursuant to employment responsi-

bilities, however, there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 424, 126 S.Ct. 1951. This holding is limited "only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints ... that are made outside the duties of employment." *Id.*

■ Here, the Plaintiff alleges the Defendant retaliated against her for advising the parent of a special education student that she did not have to accept the opinion of the school's psychologist, who had found that services were not required for the student. The Plaintiff also alleges that the Defendant retaliated against her for contacting members of the DOE. According to the Plaintiff, she contacted the DOE to ask whether her actions in a special education case had been legal (January 2005); to inquire about the status of a special education case (June 2005); and to report on certain conduct from the Defendant regarding teacher surveys (June 2005). The Plaintiff maintains that these actions angered the Defendant, causing him to retaliate against her.

In the Court's view, the Plaintiff's First Amendment claim fails as a matter of law because the Plaintiff's speech was made pursuant to the Plaintiff' official duties. As the principal of the Jerome Harrison School, it was the Plaintiff's responsibility to ensure that special education laws and procedures were implemented and followed, and if she saw any violations of a student's rights or failure to follow proper procedure, she was obligated to bring such problems to the attention of the proper people. The Court views all of the above-mentioned speech as falling under the rubric of the Plaintiff's duties. As a consequence, with regard to the above-mentioned speech, the Plaintiff was not

speaking as a citizen for First Amendment purposes.

▆▆▆ In addition, even if *Garcetti* did not have a preclusive effect, the Court believes the Plaintiff's First Amendment claim would fail under the three-prong prima facie test of (1) public concern, (2) adverse employment action, and (3) causal connection. Assuming, for the sake of argument, that the speech was a matter of public concern, the Court finds the adverse employment action and causal connection elements to be deficient here. The Plaintiff claims that the Defendant accused her of illegal conduct in front of her teachers and staff in 2004. Even if the Court were to consider this to be an adverse employment action (which, under Supreme Court precedent, it may well have been, *see Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)), it occurred before the alleged protected speech took place in 2005. Thus, there would be no causal connection between the speech and this particular adverse action.

▆▆▆ The other adverse actions appear to be a threat from the Defendant that he would freeze the Plaintiff's salary and her school's budget, and his decision to have the payment to Michael's parents come from her school's budget. With regard to the threat to freeze the Plaintiff's salary, the Plaintiff alleges that the Defendant said this when the PPT put Michael into special education. Putting Michael into special education was done by the PPT, not the Plaintiff only, and cannot be considered the Plaintiff's conduct. Moreover, it is not one of the instances of alleged protected speech in this case. With regard to the threat to freeze the school budget and the payment to Michael's parents from the school's budget, the Court does not consider these to be materially adverse acts that are necessarily directed to the conditions of the Plaintiff's specific employment. In addition, the decision to have the payment to Michael's parents come from the school budget was a decision he was permitted to make, and he has asserted that this was necessary because the special education budget for the school district lacked the funds for the payment. The Plaintiff shows nothing to rebut this. Consequently, with regard to the Plaintiff's First Amendment retaliation claim, the Defendant's motion for summary judgment **(dkt. # 30)** is **GRANTED.**

### E. QUALIFIED IMMUNITY

▆▆▆ "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Supreme Court established the analysis for determining whether an officer is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, 121 S.Ct. 2151. "[T]he next, sequential step is to ask whether the right was clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

■ The Plaintiff's Fourth Amendment claim is the only remaining claim to which the qualified immunity analysis applies. The Defendant first argues that there is no evidence that he subjected the Plaintiff to an unlawful search and seizure, and cites to its substantive Fourth Amendment analysis to support this argument. As seen above, however, the Court believes that there is evidence sufficient to support the Plaintiff's claim. Next, the Defendant argues that, even if a Fourth Amendment violation could be shown, it was objectively reasonable for him to believe that he had a right to review the Plaintiff's emails. The Court is unconvinced. To begin with, there is a question of fact as to whether it was the Defendant who, after viewing the Plaintiff's email, forwarded it to his own email account. As the Second Circuit has held, "[w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical." *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992). In addition, given the terms of the AUP, it was not necessarily objectively reasonable for the Defendant to believe that he had a right to review the Plaintiff's emails.[5] Consequently, insofar as it argues that the Defendant is entitled to qualified immunity, the Defendant's motion for summary judgment (**dkt. # 30**) is **DENIED**.

## F. STATE LAW CLAIMS

■ The Plaintiff also alleges that the Defendant intentionally inflicted emotional distress upon her and that he invaded her right to privacy. A claim of intentional infliction of emotional distress requires a plaintiff to allege that (1) the defendant intended to inflict emotional distress, or knew or should have known that it was a likely result of his conduct, (2) the conduct was extreme and outrageous, (3) the conduct caused the plaintiff's distress and (4) the plaintiff's emotional distress was severe. *DeLaurentis v. New Haven*, 220 Conn. 225, 266–67, 597 A.2d 807 (1991). The "extreme and outrageous" standard requires that the conduct "exceed[ ] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Petyan v. Ellis*, 200 Conn. 243, 254 n. 5, 510 A.2d 1337 (1986), *superseded by statute on other grounds as recognized in Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776, 865 A.2d 1163 (2005). The recitation of the alleged extreme conduct must arouse the anger of the average representative of the community and cause him or her to exclaim "Outrageous!" *See Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003) (citing 1 Restatement (Second), Torts § 46, cmt. (d) (1965)); *Appleton v. Board of Educ. of Stonington*, 254 Conn. 205, 210–11, 757 A.2d 1059 (2000). Conduct that is "merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Appleton*, 254 Conn. at 211, 757 A.2d 1059 (internal quotation marks omitted). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Id.* at 210, 757 A.2d 1059. If, however, reasonable people may differ as to whether the conduct is extreme or outrageous, the question is one for the jury. *See id.*

---

5. Indeed, although not a factor when considering whether the Defendant's conduct objectively would seem lawful to a "reasonable superintendent," it appears that the Defendant had to ask the school district's attorney about his authority to review employee emails, indicating that the Defendant himself was unsure as to the legality of his actions.

Here, the Defendant argues only that the conduct alleged does not meet the above standard. The Court, though, is unwilling to find that, as a matter of law, the Plaintiff's claim fails. The Plaintiff has alleged that the Defendant threatened and intimidated her, and that he publicly accused her of illegal activity in front of the teachers and staff of her school. In addition, the Plaintiff claims that the Defendant accessed her email account without permission, read a communication that she had sent to her lawyer, and forwarded the communication to his own email account. The Court believes that reasonable people may differ as to whether such conduct is extreme or outrageous, making it a question for the finder of fact. Consequently, with regard to the Plaintiff's intentional infliction of emotional distress claim, the Defendant's motion for summary judgment **(dkt. # 30)** is **DENIED.**

The Plaintiff also alleges a violation of her right to privacy. "The four categories of invasion of privacy are set forth in 3 Restatement (Second), Torts § 652A as follows: (a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public." *Goodrich v. Waterbury Republican–American, Inc.*, 188 Conn. 107, 128, 448 A.2d 1317 (1982). The Plaintiff's claim falls under the first category.

Although neither the Connecticut Supreme Court not the Connecticut Appellate Court has yet interpreted what consti-

tutes an invasion of privacy under the first category, the Second Restatement of Torts, adopted by the Connecticut Supreme Court in *Goodrich*, states that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) Torts § 652B (2008). This form of invasion of privacy "consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." *Id.* § 652B cmt. a. The invasion of privacy "may be by some . . . form of investigation or examination into [a person's] private concerns, as by opening his private and personal mail. . . ." *Id.* § 652B cmt. b.

Given the above, the Court is unwilling to find that, as a matter of law, the Plaintiff's invasion of privacy claim fails. The Defendant accessed the Plaintiff's email account without permission and looked at a correspondence that was not addressed to him. Even though the Plaintiff has admitted that the communication to her attorney did touch on school-related issues, the Court is unsure that this gave the Defendant an absolute right to read it.[6] Consequently, with regard to the Plaintiff's right to privacy claim, the Defendant's motion for summary judgment **(dkt. # 30)** is **DENIED.**

---

**6.** The Defendant argues that the communication was not private because the Plaintiff had testified that, as the communication was school-related, the Defendant had a right to know about it. The Court is not persuaded. First, whether the Defendant had a right to read the communication is a legal question, which the Plaintiff is not qualified to answer. Second, even if the Defendant had a right to "know about" the communication does not necessarily mean that he has the right to access another's email account so that he could read it.

## III.  CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (**dkt. # 30**) is **GRANTED in part and DENIED in part.**  With regard to the First Amendment, the Fourteenth Amendment, the Stored Communications Act, the Wiretap Act, and the Rehabilitation Act claims, the motion for summary judgment is **GRANTED.**  With regard to the Fourth Amendment, the intentional infliction of emotional distress, and the invasion of privacy claims, the Defendant's motion for summary judgment is **DENIED.**  *Therefore, the remaining claims for trial are: (1) the Fourth Amendment claim; (2) the intentional infliction of emotional distress claim; and (3) the invasion of privacy claim.*